20 So.2d 519

**EASLEY v. STATE.**

2 Div. 204.

Supreme Court of Alabama.

Dec. 14, 1944.

Rehearing Denied Feb. 1, 1945.

360

S. W. Compton, of Linden, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and John O. Harris, Asst. Atty. Gen., for the State.

BROWN, Justice.

This appeal comes to us under the automatic appeal act approved June 24, 1943, General Acts Alabama Reg.Sess.1943, and Special Sess.1942, pp. 217, 219, § 10 of which provides: "In all cases of automatic appeals the appellate court may consider, at its discretion, any testimony that was seriously prejudicial to the rights of the appellant, and may reverse thereon even though no lawful objection or exception was made thereto. The appellate court shall consider all of the testimony, and if upon such consideration is of opinion the verdict is so decidedly contrary to the great weight of the evidence as to be wrong and unjust and that upon that ground a new trial should be had, the court shall enter an order of reversal of the judgment and grant a new trial, though no motion to that effect was presented in the court below." Code 1940, Tit. 15, § 382(10).

The appellant was convicted of murder in the first degree and sentenced to death. On his trial the state, with other evidence, offered proof of a confession made by the defendant, detailing the particulars of the difficulty between himself and his wife, Dotsie Easley, the victim. This confession and the testimony given by defendant on the trial were the only evidence in the case going to show the particulars of the difficulty.

The substance of the confession and defendant's testimony on the trial was that Dotsie had gone with her mother and sister to Mobile to visit her mother's sister, Dotsie's aunt. They left on Sunday and came back on Thursday afternoon on the bus, and Dotsie got back home about 3 o'clock; and he, defendant, asked what she had been doing in Mobile, and she told him that he would have to go down there and find out. They argued a little about it while she was cooking dinner. They had dinner and he said "his wife was pouting around, sulled up and left and went to her sister's which was about a quarter of a mile or a little further, and he waited a while and decided to go down there and did go, and had a talk with her. He said she was pretty mad at him and told him he was not treating her right and she was going to leave him" and go and live with her father, that she couldn't get along with him.

"They talked along a little while and finally she left and came back to their house. They sat and talked until about nine o'clock. It was in the summer time. Then they decided to go to bed, and when they got in bed they were still fussing at each other. She got up and come around

the foot of the bed and went around and got a stick, an oak stick, and come back and stood up on her side of the bed and struck him with the stick. When she hit him his trousers were hanging on the bed post right by his head and he pulled his trousers down and got his knife, turned over on his knees in the middle of the bed and stabbed her while she was standing up by the wall and she fell down across her pillow. He got up and lighted a lamp. About that time she fell off the bed on the floor and, in some way got under the foot of the bed, and got from under the foot of the bed, went to the door, was pulling the door open, when he grabbed her and dragged her into the middle of the room, and stabbed her until she fell, and then he cut her on the neck. She kept struggling and hollering occasionally," and he happened to think of an axe handle he had in the house, and left her on the floor in a kneeling position, and he ran across the room and picked up the axe handle and he struck her once with the axe handle, and she didn't holler any more. Then he took off his under shirt, which was all he had on, and went in the kitchen and washed up. He then dressed, closed up the house, locked the door, and as he started out of the door he heard somebody speak in the road, which is just a few steps from the house. He said he just knew that voice was Dotsie's father and he was there after him and he ran then. He then went to the county jail, told the deputy sheriff that he had had a difficulty with his wife and had cut her and asked to be locked up.

The evidence further shows that in the fight he inflicted on his wife many wounds, described by Dr. G. N. Williams as follows: "She had multiple incisions of the head, neck, face and ears; had four incised wounds. An incised wound is produced by a sharp instrument. She had four incised wounds in the front and left side of her neck and throat; had incised wounds around the back of the neck here extending all the way around (indicating); had multiple incised wounds of the scalp and face; incised wounds through both ears and both ears were just ribbons where there had been many incisions just like this; and there were knife wounds through this gland in the facial artery here (indicating); she had a severance of the jugular vein on both sides; a fracture of the skull in the left temporal parietal region, this is right here (indicating); the bone was crushed."

The evidence further shows that he was a person of low mentality, but a good worker; nice and respectable among white people but fussy among his own race. Dotsie never regained consciousness, but died next morning about 5 o'clock. The evidence further tended to show that defendant loved his wife, objected to her working in the field; but that he was jealous of her, especially in respect to a man by the name of Hezekiah, who was her uncle by marriage, having married her mother's sister, the sister having died.

The court in submitting the case to the jury charged on the law of murder in the first degree and murder in the second degree, concluding the oral charge as follows: "I have given you the law on the subject and endeavored to clarify it to you; but it is a matter solely within your province to determine what are the facts from the evidence presented to you here on the witness stand. If after you have carefully considered the evidence presented to you here in this case, you are convinced beyond a reasonable doubt that the defendant is guilty of murder in the first degree as defined to you by the Court, then the form of your verdict would be either, 'We, the jury, find the defendant guilty of murder in the first degree as charged in the indictment, and fix his punishment at death by electrocution,' or 'We the jury, find the defendant guilty of murder in the first degree, as charged in the indictment, and fix his punishment at imprisonment in the penitentiary for the term of his natural life,' one of your number signing the verdict as foreman. If on the other hand, you are not convinced beyond a reasonable doubt from the evidence presented to you in this case that the defendant is guilty of murder in the first degree, but are satisfied beyond a reasonable doubt that he is guilty of murder in the second degree, the form of your verdict would be, 'We, the jury, find the defendant guilty of murder in the second degree, as charged in the indictment, and fix his punishment at imprisonment, in the penitentiary for a term of ——— years,' this would be not less then ten years and any number from ten years up, one of your number signing the verdict as foreman. If, after considering all the evidence in this case, the defendant has reasonably satisfied you from the evidence that he is not guilty by reason of insanity, the form

of your verdict would be, 'We, the jury, find the defendant not guilty by reason of insanity,' one of your number signing the verdict as foreman. If you are not satisfied beyond a reasonable doubt from the evidence that the defendant is guilty of murder in the first degree or murder in the second degree as defined to you by the Court, the burden being upon the State to satisfy you beyond a reasonable doubt that he is guilty of murder in the first degree or murder in the second degree, then it would be your duty to find the defendant not guilty, and the form of your verdict would be, 'We, the jury, find the defendant not guilty,'. * * *."

The court allowed Docie Brown, a witness for the state, to offer in rebuttal to testimony, over the defendant's objection, that "Hezekiah" visited at the home of Dotsie's aunt, when she was visiting her in Mobile.

■ · After a full consideration of the evidence we are of opinion that the great weight of the evidence goes to show that, as the result of the blow, defendant was so infuriated that he lost all sense of proportion, and became a raging beast, and that the killing was the result of passion heated blood.

■ It has long been settled law that, "Whether or not the homicide is the off-spring of malice is the characteristic which distinguishes murder and manslaughter. In consideration of the infirmities of humanity, the law regards a sudden transport of passion, caused by adequate provocation, as sufficient to rebut the imputation of malice which would otherwise arise. In such case the law imputes the homicide to inherent frailty, instead of malice or formed design. * * * A killing in sudden passion excited by sufficient provocation without malice is manslaughter, 'not because the law supposes that this passion made him (the slayer) unconscious of what he was about to do, and stripped the act of killing of an intent to commit it, but because it presumed that passion disturbed the sway of reason, and made him regardless of her admonitions.'" Smith v. State, 83 Ala. 26, 3 So. 551, 552.

■■ ·" 'Mere words, no matter how insulting, never reduce a homicide to manslaughter. Manslaughter is the unlawful killing of a human being without malice; that is, as the unpremeditated result of passion-heated blood—caused by a sudden,

sufficient provocation. And such provocation can, in no case, be less than an assault, either actually committed, or menaced under such pending circumstances as reasonably to convince the mind that the accused has cause for believing, and did believe, he would be presently assaulted, and that he struck, not in consequence of a previously formed design, general or special, but in consequence of the passion suddenly aroused by the blow given, or apparently about to be given.' * * *'" Reeves v. State, 186 Ala. 14, 65 So. 160, 161.

The effect of the court's oral charge was to limit the consideration of the jury to the offense of murder in the first or second degree. Reeves v. State, supra.

■ We are not of opinion that the automatic appeal statute is broad enough to require this court to review the oral charge of the court without exception thereto. The court erred in allowing the witness Docie Brown, offered in rebuttal, to testify that Hezekiah visited her aunt's home while the deceased, her mother and the witness were in Mobile. We are reversing on the ground that the great weight of the evidence goes to show that the punishment inflicted by the jury was excessive. Davis v. State, 245 Ala. 589, 18 So.2d 282. The rebuttal testimony was wholly immaterial and not within the influence of Pressley v. State, 166 Ala. 17, 52 So. 337; Braham v. State, 143 Ala. 28, 38 So. 919.

The judgment of the circuit court is reversed and the cause is remanded. The prisoner will remain in custody until discharged by due course of law.

Reversed and remanded.

All the Justices concur.

## On Rehearing.

GARDNER, Chief Justice.

The death penalty was inflicted. There was ample proof tending to show that defendant acted under a heat of passion. These facts find no reference in the oral charge of the court, and, indeed, the charge makes no reference to the degree of homicide in which such testimony was applicable. There were no instructions whatever upon this phase of the case. We recognize the automatic appeal statute does not require a review of the oral charge without exception reserved. But when we view all the facts in connection with this vital omission from any instructions and

the infliction of the extreme penalty of death, we are persuaded the verdict rendered is contrary to the preponderance of the evidence, and that our original conclusion, that defendant was due a new trial, is correct.

The application for rehearing is overruled.

All the Justices concur, except LIVINGSTON, J., who dissents, as indicated.

BROWN, Justice.

■ The Attorney General in brief supporting the application for rehearing asserts: "The jury and no one else can fix the punishment in a homicide case. If verdicts of juries are to be set aside because of difference of opinion, then it would seem that *the Court is usurping the power of the jury.*" [Italics supplied.]

This assertion overlooks the fact that the same constitutional "body of magistracy" that divided the offense of murder into degrees and prescribed the constituent elements of each such degree, conferring on the jury the power to determine the degree in a particular case and "at the discretion of the jury" to fix the punishment, has by the Automatic Appeal Act, in cases where the punishment is fixed at death, imposed on the Supreme Court the duty of examining all the testimony, and if in the opinion of the court the verdict of the jury is contrary to the great weight of the evidence, to reverse the judgment of conviction, though no motion for new trial has been made. General Acts, Regular Session 1943 and Special Session 1942, p. 217, § 10, Code 1940, Tit. 15, § 382(10); Constitution 1901, §§ 42, 43 and 44; Brown v. State, 109 Ala. 70, 81 and 82, 20 So. 103.

Even before the enactment of the automatic appeal statute cited above, the verdict of the jury in homicide cases was subject to judicial revision. In Brown v. State, supra, Chief Justice Brickell, speaking for this court, observed: "If under temporary excitement, or the influence of passion or prejudice, which will sometimes affect juries, a verdict should be rendered inflicting the graver punishment, when in the dispassionate judgment of the judge a milder punishment should have been imposed, it is his duty to apply the corrective of a new trial; * * *." 109 Ala. at page 84, 20 So. at page 108.

Such judicial revision has never been regarded as "usurpation," but wise and courageous judicial interposition. White v. Blair, 95 Ala. 147, 10 So. 257; Alabama Great So. R. R. Co. v. Powers, 73 Ala. 244.

Many states have enacted statutes authorizing appellate courts to intervene and apply correctives in cases where the punishment is fixed by the jury. State v. Ramirez, 34 Idaho 623, 203 P. 279, 29 A. L.R. 297 and annotations 331–342; 15 Am. Jur. p. 160, § 510.

I concur in the opinion of the CHIEF JUSTICE.

All the Justices concur, except LIVINGSTON, J., who dissents, as indicated.

LIVINGSTON, Justice (dissenting).

This court cannot take away the discretion given to juries to fix the punishment on a finding of guilt of murder in the first degree. Title 14, § 318, Code 1940. In other words, we cannot, in criminal cases, reduce the punishment fixed by the jury in the exercise of the discretion given them by law. I cannot, therefore, concur in the opinion of Mr. Justice BROWN. Nor can I agree with Mr. Chief Justice GARDNER'S interpretation of the facts in this case, and for these reasons, must respectfully dissent.