This appeal follows a conviction for the offense of second degree assault, in violation of § 13A-6-21 (a), Code of Alabama
(1975), and sentence of five years' imprisonment. For the reasons outlined below, the judgment of conviction is reversed and the cause remanded.
At the trial of the case, Alvin McCants testified that he, along with Henry St. George, went to "Jewel's Cafe" in Valley, Alabama, during the early morning hours of February 27, 1984. While they were "shooting some pool," the appellant (known to McCants as "Sugarbear"), came in with his girl friend, Bernita Watson. (Bernita is also St. George's sister.) Bernita came over to St. George and struck up a conversation. McCants went over to Bernita and told her that it was her night to pay for the pool game because McCants had paid for the games the night before. At this point, McCants heard the appellant say, "Look at the son-of-a-bitch putting his arm around my woman just like I ain't standing here." McCants went to the appellant and apologized, and explained that "I didn't know this was your [appellant's] lady." McCants testified that the following then occurred:
 "[McCants]: Then St. George told me to come on let's go. Then we started out the door. Just as I stepped outside the door [the appellant] pushed me down in the mud.
"Q. Can you describe how that happened, please?
 "A. Well, I was coming out the door like this, coming from the table like this. And just as I got outside the door he pushed me down in the mud. And I got up. And I said, `What's wrong with you?' I said, `What you doing, man?' Just like that. His brother told him to leave me alone. He said, `That man ain't bothering you.'
". . .
 "Q. Now, when [the appellant] pushed you down outside the cafe, what happened after that?
 "A. I got up and went on around and got in the car and told St. George, `Let's leave.'
"Q. Okay. Did you get inside the car?
"A. I was sitting inside the car.
"Q. What part of the car did you get into?
"A. On the passenger side.
"Q. What did Mr. St. George do?
 "A. Mr. St. George was standing in the door getting ready to back out.
"Q. What happened then?
 "A. Then [the appellant] came around and snatched the door open and came on the inside with his knife.
"Q. Can you describe what he did, please?
 "A. When he came around with the knife he said, `I'll cut your throat.'
"Q. What happened then?
 "A. And when he said that I reached and caught his arm. I said, `What's wrong with you?' And so his brother snatched him out of the car then. St. George came around the car. And him and his brother got him and brought him out the car again. And before he could *Page 511 
leave — before he could get back in the car — out of the car again he was back in the car with the knife again, wrestling.
"Q. Were you struck anywhere?
"A. Struck me right here and cut me right here.
"Q. Where, please?
"A. Cut me from right here to right here.
 "Q. Did he say anything else to you when that happened?
 "A. After that happened I told St. [George] to come on and take me to the hospital. [The appellant] said, `Bleed, mother fucker, bleed.'"
McCants then testified that he was taken to the hospital for surgery and was given seven stitches, "on the outside" as well as the "inside" of his hand. According to McCants, he has "no feelings" in the hand which was cut by the knife. On the night of the assault, McCants testified that he did not threaten the appellant, and was not armed. He also stated that he did not reach under the seat of the car.
McCants testified that about three weeks later he saw the appellant, and he stated that the following occurred at that meeting:
 "[McCants]: [The Appellant] told me he was sorry [for] the way he acted and everything. He wanted to apologize. He said he had talked to his mother and his mother told him his father and I had grew up together. He didn't know what was wrong. He said he was sorry.
"Q. Okay. Did he say anything else?
"A. He asked me did I want a drink.
"Q. Asked you if you wanted a drink?
"A. Yes, sir.
 "Q. I mean about cutting you. Did he say anything else about cutting you?
 "A. The only thing he said he didn't — he may get some time, two or three years. He said he deserved that because he was wrong.
". . .
 "Q. Mr. McCants, when he apologized to you for cutting you, did he offer any explanation?
 "A. Yes. He said he was wrong. He didn't know what came over him."
On cross-examination, McCants denied that he was drunk or intoxicated on the night in question, but admitted that he "had been drinking." McCants stated that he was not carrying a gun on the night in question, but admitted that he owned a Derringer, which had been at a pawn shop for approximately two months before the assault.
On redirect examination, McCants testified that after he got into the front seat of St. George's car, the appellant "snatched the door open and come in with his knife." According to McCants, the appellant put the knife around McCants's neck and said, "Don't you believe I'll kill you?" The appellant's brother and St. George had to pull the appellant out of the car. When St. George then returned to the driver's side to leave, the appellant came back a second time. McCants testified: "[I thought he was] just going to cut my throat anyway. So I held his arm. And he pulled the knife like this." According to McCants, the appellant would have cut his throat the first time if his brother and St. George hadn't pulled the appellant out of the car.
On behalf of the State, Henry James St. George, Jr., testified that he went with McCants to Ms. Jewel's cafe on the night in question to play pool; that while they were there, St. George's sister, Bernita, came up to them; that because McCants had paid for their pool game on a previous night, McCants told Bernita and her friend, Jennifer, that it was "their night to pay for the pool game"; that when McCants put his arm around Bernita, the appellant exclaimed, "Take your damned hands off my woman. That's my woman." According to St. George, McCants immediately took his arm away from Bernita and apologized to the appellant. McCants and St. George then left the cafe.
At this point, St. George stated, "Everything happened so quick." When McCants reached the door of the cafe, the appellant "rushed at him." He said that McCants fell to the ground and St. George, along with the appellant's brother, "got in between *Page 512 
them and broke them up." He said that McCants and St. George got to the car and started to back out of the parking lot, and that as they were leaving the lot, the appellant "opened the door and jumped in." St. George said he put the car's transmission in park and jumped out. The appellant, he said, was leaning over McCants who was "trying to get out of the way." St. George said he ran around to the other side of the car and called for the appellant's brother and they tried to pull the appellant from the car. After they got the appellant out of the car, St. George said, he "noticed Mr. McCants was bleeding." According to St. George, the blood was "on the seat, all over the car." The appellant's brother, according to St. George, said, "Ain't no cause for all that." St. George testified that the following then occurred:
 "[St. George]: "Well, when [the appellant] jumped back in the car he grabbed Mr. McCants by the neck, by the head some kind of a way. He had his other hand around his throat and asked him, `Don't you believe I'll kill you, mother fucker?'
"Q. All right. You heard that yourself?
"A. Yes, sir, I did.
"Q. What happened then, Mr. St. George?
 "A. We pulled him out again. And after we got him out that time and saw Mr. McCants was bleeding I took him on to the hospital."
St. George stated that there was no gun in the car and that he did not hear Mr. McCants make any threats to the appellant.
On behalf of the appellant, Bernita Wilson testified that on the night of February 27, 1984, she went to Jewel Watson's house, along with the appellant. When they got there, McCants, Jennifer Taylor, and Henry St. George, Bernita's brother, were there, along with "a lot more people." Because McCants and Ms. Watson had been "fussing," McCants was ordered to leave. After McCants left, Bernita and the appellant went next door to the cafe to play pool. Bernita stated that she was standing by the heater when McCants came over, put his arm around her, and started "kind of whispering in [my] ear." Then, she said, the appellant walked up and asked McCants, "Ain't you going to give me some kind of damn respect?"
Bernita said she told McCants she did not want to play pool and left the cafe to go to her car. She said she saw McCants leaving the cafe but did not see what happened after that. According to Bernita, her brother was already in his car when McCants went to the car. Bernita stated that she did not see anything because she was "mad" at both the appellant and McCants. According to Ms. Wilson, the appellant had been drinking on the night in question. She stated that she did not learn that McCants had been hurt until the next day when her brother told her.
The appellant testified in his own behalf and stated that, on the night of February 27, 1984, he, along with Bernita Wilson and Jennifer Taylor, went to Jewel Watson's house. When he entered the house, he said, McCants and St. George were "sitting around playing spades." According to the appellant, McCants had been drinking and was having an argument with Jewel Watson. He testified as to her statements to McCants: "Excuse my language — she said, `Son of a bitch if you don't leave, I'll blow your brains out, take my shotgun and blow your brains out.'" McCants left the house, according to the appellant, but he "took his time about leaving." McCants said that he, along with St. George, went to the cafe next door to play pool.
The Appellant testified that after he had finished his beer, he went to the cafe to play pool with Bernita. He said that as he was racking the balls, Bernita went over to the heater and "that's when [McCants] approached [and put] his arm around her." The appellant said he told McCants, "Man, give me some kind of damn respect." Bernita left the cafe, the appellant said. A few minutes later, McCants also left but he was "still grumbling, cussing, going on."
At this point, the appellant said, the appellant's brother approached him and said, *Page 513 
"Man, don't you know that man carries a gun?" The appellant said he then decided to leave the cafe, and he stated that the following occurred:
 "When I got outside to go to my car, the door was open. He was bending up under the seat. I thought he was going to get a gun and come out. When I got close to the car — I couldn't go on the driver's side. I had to go around on his side to get down the bank. The door was open like he was going to come out from up under the seat with his left hand. And he came up. That's when I caught him. I know he carried a gun. When he pulled his arm he cut himself. I had the knife protecting myself. I do carry a knife. He always carries a gun. I know this for a fact."
The appellant admitted that he had never seen McCants with a gun and that his statement that he "knew" that McCants carried a gun was "completely supposition." The appellant also admitted that he did not know that McCants had a gun that night and, in fact, never saw a gun on the night in question.
According to the appellant, he had been "drinking" that night and was "tipped a little bit." McCants, according to the appellant, was "drunk, also". The appellant stated that he did not "go in the car no second time on nobody." He stated that he was "always afraid of the man," and said: "I know he carries a gun. I was frightened. I was so scared I panicked." The appellant denied that he was mad or hostile and stated that McCants was "dangerous."
The appellant stated that after the incident he went to a housing project in Lanett to visit a cousin. He happened to see McCants on that day and asked McCants if he wanted to talk. The appellant testified that he knew "McCants ain't got no job anywhere" and said he offered him ten or fifteen dollars to "help him out." According to the appellant, McCants did not "want to prosecute me at all." The appellant admitted that, at the time he talked to McCants, he knew that McCants had pressed charges against him for a felony offense. On cross-examination, the appellant stated that he did not give McCants any money because "he's able to work as well as I am."
 I
The first issue is stated as follows: "Was the court in error when it refused to charge the jury, upon the request of the defendant, as to the lesser included offense of assault in the third degree?" According to the appellant, a jury charge for the offense of third degree assault was warranted because he contends that the victim "cut himself accidentally" when the appellant pulled a knife on the victim "in order to avert an apprehended attack with a gun." According to the appellant, McCants was cut inadvertently when the appellant grabbed McCant's hand to prevent McCants from drawing a gun. Thus, the appellant could have only been convicted of assault in the third degree, pursuant to the provisions of § 13A-6-22, Code ofAlabama (1975).
In relevant part, § 13A-6-21 (a), Code of Alabama (1975), provides that "a person commits the crime of assault in the second degree" under the following circumstances:
 "(1) [If, with] intent to cause serious physical injury to another person, he causes serious physical to any person; or
 "(2) [If, with] intent to cause physical injury to another person, he causes physical injury to any person by means of a deadly weapon or a dangerous instrument; or
 "(3) [If he] recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; . . ."
Under the provisions of § 13A-6-22 (a), the offense of assault in the third degree is committed if a person does one of the following acts:
 "(1) With intent to cause physical injury to another person, he causes physical injury to any person; or
 "(2) He recklessly causes physical injury to another person; or
 "(3) With criminal negligence he causes physical injury to another person *Page 514 
by means of a deadly weapon or a dangerous instrument; . . ."
As a general rule the trial court is not required to give a jury charge on a lesser included offense unless, in its discretion, it concludes that the evidence presented would support the charge. Absent an abuse of that discretion, this court will not disturb a trial court's decision. Witherspoon v.State, 356 So.2d 743 (Ala.Cr.App. 1978); Gratton v. State,456 So.2d 865 (Ala.Cr.App. 1984). As this court, per Presiding Judge Bowen, recently noted:
 "A judge may properly refuse to charge on lesser included offenses only where the only reasonable conclusion from the evidence is that the accused is guilty of the offense charged or no crime at all or where the requested charge would have a tendency to mislead or confuse the jury." McKeithen v. State, 480 So.2d 36 (Ala.Cr.App. 1985). (Citation omitted.)
Under Alabama law, "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." § 13A-1-9 (b), Code of Alabama (1975).[1]
Under the evidence presented in this case, however, the appellant was entitled to the requested charge. In Ex parteStork, 475 So.2d 623, 625 (Ala. 1985), the Alabama Supreme Court stated as follows:
 "`An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position. [Citation omitted.] A court may properly refuse to charge on lesser included offenses only (1) when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) when the requested charge would have a tendency to mislead or confuse the jury. [Citation omitted]. In fact, our decisions are to the effect that every accused is entitled to have charges given which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility. [Citation omitted.]'" Quoting Ex parte Chavers, 361 So.2d 1106 (Ala. 1978).
As this court, per Presiding Judge Bowen, recently stated inMcDougal v. State, 488 So.2d 15 (Ala.Cr.App. 1986):
 "It is fundamental that `[a]n individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position.' Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978)."
In this case, a "reasonable theory" under the evidence presented by the appellant would support the requested charge. For this reason, the appellant was entitled to the jury charge on assault in the third degree. Williams v. State,474 So.2d 178, 181 (Ala.Cr.App. 1985).
Because the trial court did not give the requested jury charge, the appellant's conviction is reversed and the case remanded to the trial court. We will not consider the additional issues raised by the appellant at this time.
REVERSED AND REMANDED.
All the Judges concur.
[1] Assault in the third degree would be considered a lesser included offense of assault in the second degree under the authority of Wyatt v. State, 419 So.2d 277 (Ala.Cr.App. 1982). *Page 515