24 So.3d 1157 (2009)
Kenneth Bernard JAMES
v.
STATE of Alabama.
CR-06-0396.
Court of Criminal Appeals of Alabama.
May 1, 2009.
*1158 William M. Dawson, Jr., and Stephen Cochran Wallace, Birmingham, for appellant.
Troy King, atty. gen., and Tracy M. Daniel, asst. atty. gen., for appellee.
KELLUM, Judge.[1]
The appellant, Kenneth Bernard James, was convicted of intentional murder, a violation of § 13A-6-2, Ala.Code 1975. He was sentenced to life imprisonment. He was also ordered to pay court costs, restitution, and all applicable fines. James appeals that conviction and sentence.
The evidence presented at trial tended to establish the following. Jo Mo Odom[2] testified that on August 21, 2004, he was living at a residence on 19th Place Southwest in Birmingham. On that afternoon, he and his friend, Michael McFarland, were outside the residence sitting on McFarland's automobile. Odom was sitting on the hood of the automobile, and McFarland was sitting on the trunk. *1159 While they were sitting on the vehicle, Odom watched Kenneth Bernard James drive his vehicle by them a couple of times.
Around 4:00, p.m., James stopped his car, and McFarland got into James's automobile. McFarland and James conducted a conversation in James's automobile. James and McFarland then got out of James's car and walked over to McFarland's vehicle.
James gave McFarland a cellular telephone, and McFarland placed the phone on a charger in his automobile. After a short time, McFarland gave the phone back to James, but kept the phone's "phone chip," i.e., the "SIM"/memory card. James told McFarland that he needed the phone chip, and that he could not leave without it. McFarland said that the chip belonged to him. According to Odom, there was no argument at that point.
James then got into his car and drove away. Approximately two to three minutes later, James turned his vehicle around and came back to McFarland's vehicle. James parked his car beside McFarland's car and got out. James approached McFarland, who was sitting on the trunk of his vehicle and again asked him for the phone chip. McFarland responded that he was not going to give James the chip.
Odom testified that at that point, a cell phone in James's pocket rang, and James removed the phone from his pocket and answered it. At the conclusion of the call, James put the phone back into his pocket. Odom testified that when James reached into his pocket a second time, he thought James was going to answer his cell phone again; instead, James pulled out a revolver with his right hand. James then shot McFarland in the chest twicethe first time in the area of McFarland's heart, and the second time, higher on his chest.
When James walked to where Odom was sitting on the front of the car, Odom put his hands in the air and stated, "I ain't got nothing to do with it." (R. 102.) James walked back to where McFarland was and put the gun to McFarland's head, but he did not shoot. James then left.
Odom testified that McFarland did not have a gun with him that day; he stated there had not been any type of argument or scuffle between James and McFarland when the shooting occurred.
Odom testified that after McFarland was shot he immediately telephoned the police from the "house phone" that he had with him at the vehicle. The police arrived in approximately 15-20 minutes.
Jo Mo Odom's brother, Tramayn Odom, and Bobby Richardson were walking toward Odom's home when they saw James drive his vehicle past them, turn around, and pull up beside McFarland's vehicle. McFarland was sitting on the trunk of his vehicle. Both vehicles were facing Tramayn Odom and Richardson.
According to Tramayn and Richardson, James got out of his vehicle and approached McFarland and stood facing McFarland at approximately an arm's length distance. Tramayn and Richardson testified that they heard James tell McFarland, "Give me the chip." (R. 62-63; 68.) Tramayn testified that he then heard McFarland tell James, "[T]he chip don't come with it. Just the phone." (R. 62-63) Both Tramayn and Richardson testified that they did not see any altercation or argument between McFarland and James.[3]
*1160 According to their testimony, James shot McFarland, and McFarland fell off the automobile. Richardson testified that approximately five seconds later, James shot McFarland a second time. After shooting McFarland, James aimed the gun at Jo Mo Odom. Tramayn Odom testified that James put the gun down and stood over McFarland before getting into his vehicle and driving away.
Tramayn Odom got a pillow and a blanket for McFarland. Tramayn and Richardson tried unsuccessfully to revive him.
No weapon was recovered from the scene. A purple book bag containing drugs was recovered from the trunk of McFarland's vehicle, and a small plastic bag containing syringes was found in the glove compartment. The police did not find any cell phone, memory card for a cell phone, or gun in McFarland's car.
McFarland suffered three gunshot wounds to his bodytwo in his chest, and one in the webbing between the fingers on the palm of his hand. He died as a result of the gunshot wounds to his chest. According to the medical examiner, the muzzle of the gun was at least 18" from the point of entry into McFarland's body when the shots were fired. McFarland's urine tested positive for cocaine and opiates.
James testified in his defense. He testified that he and McFarland were friends and that they had conducted drug transactions in the past. Around 3:30 p.m. on August 21, 2004, James saw McFarland as he drove near where McFarland was standing in the street. McFarland motioned to James, and James pulled his car beside McFarland's car. McFarland told James that he wanted to buy some drugs. When McFarland got into James car, James asked him, "Where the money at?" (R. 177.) McFarland told James that after Jo Mo made a sale, he would have the money. James waited for a while, but left when he received a telephone call.
James testified that he returned to the car because McFarland continued calling him on his cell phone. McFarland told James that he wanted to buy back the telephone McFarland given him to pawn. When James returned, he drove down the street and made a U-turn, then returned and parked beside McFarland's car.
James stayed in his car and asked McFarland for the money. At that point, McFarland got into his own vehicle with Jo Mo, then he got out of his vehicle and came to James's car. James testified that McFarland put a black revolver to his head and told James to get out of the car. James complied and put his hands into the air.
McFarland asked for his cell phone, but James testified that he had sold it earlier. James then reached into the car to get McFarland's other cell phone. When he gave McFarland the cell phone, McFarland asked him, "Now, where the dope at?" (R. 180.) James replied, "I ain't got no dope." (R. 180.) McFarland said, "No, I know you got the dope." (R. 180-81.) James reached into his sock, and gave McFarland a bag of "dope."
James testified that McFarland then demanded money. When James denied having any money, McFarland placed the gun under his left arm, and patted James down with his right hand. McFarland was holding his cell phone in his left hand. While this was transpiring, Jo Mo was telling McFarland that he was going to have to kill James, because James would tell McFarland's father and uncle about the incident.
James grabbed the gun from under McFarland's arm. James testified that McFarland reached up under his shirt, so he thought McFarland was retrieving another *1161 gun. James backed up and hit the bumper of his own car and fired two shots. He testified that he was terrified and that he was in fear for his life when he fired the gun. James said that he thought McFarland was going to kill him. James testified that he did not intend to kill McFarland, only to get him to back away.
According to James, Jo Mo looked like he was going to run toward him, but he stopped. James said that he then dropped the gun, got into his car, and drove away.
Ivan Batain testified for the defense. He was standing in the street in front of Mario McFarland's[4] house on 19th Place Southwest, when he saw what appeared to him to be a robbery in progress; namely, Michael McFarland robbing Kenneth James. Batain stated that McFarland was pointing a gun at James, and James had his hands in the air. As Batain walked toward the front porch of McFarland's house, he heard gunshots.
James was not arrested and charged with McFarland's murder until almost two months after the incident.

I.
James contends that the trial court committed reversible error in refusing to charge the jury on provocation manslaughter. He maintains that the "record contains sufficient evidence to warrant submission of that theory of the case to the jury." (James's brief, p. 24.)
Defense counsel submitted proposed written jury charges on provocation manslaughter. During the charge conference, defense counsel requested that the trial court charge on provocation manslaughter as a lesser-included offense of intentional murder. Defense counsel argued that James's testimony that he was ordered out of his car at gunpoint, robbed, patted down, and threatened with death, provided sufficient evidence of provocation to necessitate submitting the issue to the jury. Defense counsel also argued that self-defense and provocation manslaughter are not mutually exclusive, and whether there was sufficient provocation recognized by law should be a question for the jury.
The trial court refused to charge the jury on provocation manslaughter because, it found, the charge was not warranted under the fact situation. The trial court reasoned that there was no "heat-of-passion" presented and that James's own testimony established that he acted out of fear for his life. Thus, the trial court determined that he was either guilty of murder, or he was innocent because he acted in self-defense.
Because of its relevance to the present case, we quote at length from McDowell v. State, 740 So.2d 465 (Ala.Crim.App.1998).
"`"A person accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position. Chavers v. State, 361 So.2d 1106 (Ala.1978); Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973); Wiggins v. State, 491 So.2d 1046 (Ala.Cr.App.1986); Wilkerson v. State, 486 So.2d 509 (Ala.Cr.App. 1986). A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury. Lami v. State, 43 Ala.App. 108, 180 So.2d 279, cert. *1162 denied, 278 Ala. 710, 180 So.2d 282 (1965). Every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility. Ex parte Stork, 475 So.2d 623 (Ala.1985); Chavers v. State, supra; Burns v. State, 229 Ala. 68, 155 So. 561 (1934). Section 13A-1-9(b) provides, `The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.'
"`"`The "safer" practice is to charge upon all degrees of homicide: "(It) is much the safer rule to charge upon all degrees of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree." Pierson v. State, 99 Ala. 148, 153, 13 So. 550 (1893), approved in Williams v. State, 251 Ala. 397, 399, 39 So.2d 37 (1948).'
"`"Phelps v. State, 435 So.2d 158, 163 (Ala.Cr.App.1983)."
"`Anderson v. State, 507 So.2d 580, 582-583 (Ala.Crim.App.1987).
"`The offense of "heat-of-passion" manslaughter is defined in § 13A-6-3(a)(2), Code of Alabama 1975, as follows:
"`"(a) A person commits the crime of manslaughter if:
"`" ....
"`"(2) He causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself."
"`"[Section] 13A-6-3(a)(2) is designed to cover those situations where the jury does not believe a defendant is guilty of murder but also does not believe the killing was totally justified by self-defense." Shultz v. State, 480 So.2d 73, 76 (Ala.Crim.App.1985). See also Shiflett v. State, 507 So.2d 1056 (Ala.Crim.App.1987).'
"Williams v. State, 675 So.2d 537, 540-41 (Ala.Crim.App.1996). This court has also stated:
"`The defendant must present evidence of legal provocation to require a charge on heat of passion.
"`"`"Manslaughter is the unlawful killing of a human being without malice; that is, the unpremeditated result of passion-heated blood-caused by a sudden, sufficient provocation. And such provocation can, in no case, be less than assault, either actually committed, or menaced under such pending circumstances as reasonable to convince the mind that the accused has cause for believing, and did believe, he would be presently assaulted, and that he struck, not in consequence of a previously formed design, general or special, but in consequence of the passion suddenly aroused by the blow given, or apparently about to be given"....'"
"`Easley v. State, 246 Ala. 359, 362, 20 So.2d 519, 522 (1944), quoting Reeves v. State, 186 Ala. 14, 16-17, 65 So. 160 (1914).
"`The mere appearance of an imminent assault may be sufficient to constitute legal provocation to support *1163 heat-of-passion manslaughter. Cox v. State, 500 So.2d 1296, 1298 (Ala.Cr. App.1986). "To constitute adequate legal provocation, it must be of a nature calculated to influence the passions of the ordinary reasonable man." Biggs v. State, 441 So.2d 989, 992 (Ala.Cr.App.1983).'
"Harris v. State, 683 So.2d 26, 28 (Ala. Crim.App.1996).
"In addition, `Provocation has been defined as that treatment by another which arouses anger or passion, which produces in the minds of persons ordinarily constituted the highest degree of exasperation, rage, anger, sudden resentment, or terror. Johnson v. State, 129 Wis. 146, 108 N.W. 55 (1906).' Nelson v. State, 511 So.2d 225, 240 (Ala. Crim.App.1986), aff'd, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).
"In denying McDowell's requested charges on manslaughter, the trial court stated that because McDowell had testified that his purpose in returning to the scene was to effect a reconciliation, it would be improper to instruct the jury on heat-of-passion manslaughter because McDowell was not `in such a blind fury that he acted regardless of the admonition of the law, in other words, that he was beside himself with fury in the shooting.' The trial court failed to recognize that passion encompasses more than the single emotion of fury or rage. Black's Law Dictionary 1124 (6th ed.1990) defines passion as it relates to manslaughter as `any of the emotions of the mind known as rage, anger, hatred, furious resentment, or terror, rendering the mind incapable of cool reflection.' J. Miller, Handbook of Criminal Law § 92(d) (1934), states: `Although the passion of manslaughter is frequently referred to as a passion of anger it may be any of the other emotional outbursts which are referred to as passion as for instance sudden resentment, or fear, or terror, provided only that it result from adequate provocation and that it be actually the cause of the killing.' There was evidence presented that, if believed by the jury, would support a finding that in those moments when Simon was approaching him, McDowell believed that Simon was about to assault him and that McDowell acted out of fear.
"It also appears that the trial court concluded that the evidence presented supported a jury charge on either self-defense or `heat-of-passion' manslaughter, but not on both. However, the fact that McDowell argued that he had acted in self-defense did not preclude a jury charge on `heat-of-passion' manslaughter.
"`"Although the labels have now changed with the restructuring of homicide offenses in Alabama's new Criminal Code, the analyses applied in Reeves [v. State, 186 Ala. 14, 65 So. 160 (1914)] and Roberson [v. State, 217 Ala. 696, 117 So. 412 (1928) ] still apply . . . . The Roberson court emphasized that `a defendant who claims self-defense is not thereby precluded from asserting that the homicide was committed under circumstances reducing it to manslaughter, where the evidence before the jury would so authorize.' The weight and credibility of appellant's evidence was a matter exclusively within the province of the jury and a proper manslaughter charge was warranted. Dennis v. State, 112 Ala. 64, 20 So. 925 (1896); Roberson v. State, supra. Although the new code restructuring of homicide offenses has helped somewhat, the difficulty of distinguishing between murder and manslaughter in any given case still exists. Therefore, *1164 it is still much the safer rule to charge upon all the degrees of homicide included in the indictment when a party is on trial for murder. Dennis v. State, supra. Reeves v. State, supra; Roberson v. State, supra; Phelps v. State [, 435 So.2d 158 (Ala.Cr.App. 1983) ], and cases therein cited."'

"Hill v. State, 485 So.2d 808, 809-10 (Ala.Crim.App.1986), quoting Wyllie v. State, 445 So.2d 958, 963 (Ala.Crim.App. 1983)."
740 So.2d at 467-69. See also Miller v. State, 739 So.2d 1143 (Ala.Crim.App.1999); Williams v. State, 675 So.2d 537 (Ala. Crim.App.1996).
Here, James testified that McFarland who was considerably larger in stature than Jamespointed a gun at James, ordered James out of his car, patted him down, and then attempted to rob him. While this was transpiring, Jo Mo Odom remarked that McFarland would have to kill James so that James could not tell McFarland's father and uncle about the incident. James testified that he grabbed the gun from McFarland, as McFarland tried to pat him down. James testified that he thought McFarland was reaching for another gun, so he stepped back and fired the gun twice because he thought McFarland was going to kill him. James testified that he was terrified during the incident.
After reviewing the evidence in light of the principles set forth above, we hold that there was sufficient evidence of provocation to necessitate submitting the issue to the jury. Self-defense and provocation manslaughter are not mutually exclusive, and whether there was sufficient provocation recognized by law was a question for the jury. Accordingly, the trial court committed reversible error in refusing to charge the jury on provocation manslaughter.
Although the judgment in this case must be reversed for the reason set forth above, out of an abundance of caution we deem it necessary to address an additional issue raised by James that could arise in any future proceedings.

II.
James contends that the trial court erred when it allowed the prosecution to question James about his postarrest silence, in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
During cross-examination, the prosecutor questioned James about what he did after he shot McFarland, and the following exchange occurred:
"Q [PROSECUTOR]: ... At that point, you get in your car and you leave.
"A: Yes.
"Q: Let me ask you this. Did you go to the nearest police station?
"A: No, sir.
"Q: Okay. Did you go to the police at all that particular day?
"A: No, sir.
"Q: Okay. You went to the police the next day.
"A: No, sir.
"Q: The next week.
"A. No, sir.
"Q: You eventually made a police report about that robbery attempt.
"A: I eventually went to you.
"Q: Did you eventually call the police, and make a report, and sign your name to it, identifying the folks that tried to rob you?

*1165 "A: No, sir, I had went and got me a lawyer."
(R. 197-98.)
A few questions later the following colloquy occurred:
"Q: ... When were you arrested, sir?
"A: October 13th, I believe.
"Q: Was that approximately two months later?
"A. Yes sir.
"Q. When you were arrested, did you tell the police about the robbery?
"[DEFENSE COUNSEL]: Judge, I object. There is
"A: "No, sir.
"[DEFENSE COUNSEL]: a Constitutional issue here. We move for a mistrial.
"[THE COURT] Overruled and denied."
(R. 198-99.)
The trial court then told defense counsel that it would let him elaborate on his objection later, and the prosecution asked one final question:
"Q. So, you never told the police about the robbery?
"A. No, sir."
(R. 199.) Defense counsel again objected, and the trial court overruled that objection.
Outside the presence of the jury, defense counsel expounded upon his previous objection:
"[DEFENSE COUNSEL]: Okay, the State asked the question, `After you was [sic] arrested you didn't tell the police about the robbery and that?' It's all one thing. There is obviously no requirement that a defendant do that. He has a right to remain silent, to not be required to say anything, and we think any comment upon his failure to do so invades his 5th Amendment privilege and would require curative instructions.
"....
"[PROSECUTION]: Your Honor, the defendant testified that he was robbed by the victim. He said that a crime was committed against HIM. I specifically asked him about the crime that was committed against him. I did not go into the prima facie case of our case of murder. I specifically asked him about telling the police about the crime that was committed against him, according to his own testimony.'
"[DEFENSE COUNSEL]: Well, we submit the question was phrased `Upon your arrest.' He certainly wasn't arrested for being the victim of a robbery."
(R. 200-01.)
The trial court denied the request for curative instructions.
"The prohibition against impeaching a testifying defendant with his postarrest silence does not apply where the jury has not been shown that the defendant's silence was preceded by Miranda warnings. In Fletcher v. Weir, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the United States Supreme Court limited its holding in Doyle [v. Ohio, 426 U.S. 610 (1976),] as follows:
"`In the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony.'

*1166 "455 U.S. at 607, 102 S.Ct. 1309. `"[T]he key to the exclusionary rule of Doyle is the giving of Miranda warnings."' Kidd v. State, 649 So.2d 1304, 1307 (Ala.Crim.App.1994), quoting Sulie v. Duckworth, 689 F.2d 128, 132 n. 1 (7th Cir.1982) (Cudahy, J., dissenting), cert. denied, 460 U.S. 1043, 103 S.Ct. 1439, 75 L.Ed.2d 796 (1983). The adverse use of a defendant's silence in the absence of Miranda warnings is permitted. See, e.g., Gainer v. State, 553 So.2d 673, 683 (Ala.Crim.App.1989). In this case, nothing in the record suggested that Rogers was given his Miranda rights after he turned himself in to police or at any time thereafter, and Rogers makes no such assertion in his brief to this Court. Therefore, the State's questioning of Rogers regarding his silence was proper."
Rogers v. State, 819 So.2d 643, 652 (Ala. Crim.App.2001).
In this case, at the time the allegedly improper question was propounded, there was no evidence before the jury that James had been informed of his Miranda[5] rights, and, as in Rogers, James "makes no such assertion in his brief to this Court." Rogers, 819 So.2d at 652. Although the better practice would be to scrupulously avoid any question or comment that could be misinterpreted as a comment on a defendant's postarrest, post-Miranda silence, under these facts we cannot conclude that the prosecution's single question regarding why James did not tell the police about the alleged robbery after his arrest constituted reversible error. However, we caution the trial court to take care that no Doyle v. Ohio violation arises in any future proceedings.
For the reason set for in Part I, James's conviction and sentence are due to be, and they are hereby, reversed, and this cause is remanded to the trial court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
WISE, P.J., and WINDOM, J. concur.
WELCH, J., concurs in the result, with opinion.
WELCH, Judge, concurring in the result.
As to this Court's "caution" in Part II, I note that the trial court was not confronted with a Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), problem because no witness testified that the defendant was ever read his Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) rights. I trust the trial court to properly handle this issue should it arise during the retrial.
NOTES
[1] This case was originally assigned to another judge on the Court of Criminal Appeals; it was reassigned to Judge Kellum on January 20, 2009.
[2] In the trial transcript, this witness is sometimes referred to as "Jo Mo" Odom and sometimes referred to as `Jumbo' Odom. For purposes of this opinion, we will refer to him as Jo Mo Odom.
[3] On cross-examination, Richardson testified that he told police that he heard James and McFarland arguing.
[4] Mario McFarland is Michael McFarland's cousin.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).