WELCH, Judge.
 

 Kevin Dewayne Lane was indicted on July 13, 2007, by a Jefferson County grand
 
 *127
 
 jury for the murder of Ronald Smith, a violation of § 13A-6-2, Ala.Code 1975. Lane was tried before a jury and was convicted as charged in the indictment. On October 27, 2008, the trial court sentenced Lane to a term of imprisonment of 75 years.
 

 The evidence presented at trial tended to show that Lane and Ebony Smith had, over a period of four or five years, been involved in a romantic relationship. Lane believed that he was the father of Ebony’s toddler, C. However, Ebony testified that Lane was not the child’s father and that she had said or done nothing to lead Lane to believe that he was the child’s father. Ebony acknowledged that Lane had a tattoo with C.’s name and birthdate on his back. Ebony, Lane, and C. lived with Lane’s mother for a period. Ebony testified that she ended her romantic relationship with Lane but that they remained friends and that he helped her with C.
 

 Ebony testified that she and Ronald Smith had dated intermittently, and they had a child, R., in November 2006. Lane continued to visit Ebony at her apartment even after R. was born; he had a key to the apartment, and he stayed overnight with Ebony one or two nights per week. Smith and Lane knew one another from school, Ebony said.
 

 Ebony testified that she and Smith had been dating again before Smith was killed and that Lane was aware that they had been dating. She testified that she and Smith had agreed that Smith would move into her apartment on February 10, 2007, but that he had actually moved his belongings into her apartment a day earlier — the day he was killed. Ebony testified that, during the weeks before the shooting, Lane had told her that he was going to kill Smith.
 

 Testimony about the events leading up to the shooting revealed disputed facts. Ebony testified that she and Smith were in the children’s bedroom in her apartment when Lane walked into the apartment. She stated that she had not asked Lane to come to her apartment. Ebony said that Lane walked into the kitchen and that she told Smith to stay in the bedroom. Smith, who apparently knew something about Lane’s relationship with Ebony, ignored Ebony and followed Lane into the kitchen. Smith told Lane to leave the apartment, and he pushed Lane against a kitchen wall. Ebony acknowledged that Smith had “jumped right into [Lane’s] face” and that Smith was not happy at that point. (R. 250.) A fight ensued, she said, and the men fought in the kitchen, in the living room, down a hallway, and in the bathroom. Ebony said that she saw the two men “tussling” over a gun and that Lane got control of the gun and fired two shots. She could not tell where the gun was pointed when she saw Lane fire the first shot, and she ran out of the apartment after two shots were fired. She heard two additional shots after she left the apartment.
 

 Ebony testified that when she left her apartment she went inside a neighbor’s apartment. She looked out of the peephole of the door to that apartment and saw Lane leaning over a banister near the stairs; he was, she said, “messing around with the gun.” (R. 212.) Ebony said she saw Lane reenter her apartment, then exit, carrying C. Ebony left the neighbor’s apartment and she saw Smith lying at the top of the stairway.
 

 When officers arrived at the apartment, they saw Smith’s body on the outside stairway. Officers testified that it appeared that there had been a fight in the apartment; the drywall had punch marks or holes in it, and blood and bullet holes were seen inside.
 

 
 *128
 
 Lane was apprehended after he drove away from Ebony’s apartment. His right eye was swollen, and he had injuries on his face; he appeared to have been in a fight, according to a police officer who questioned Lane. Lane was not wearing a shirt when he was arrested. The firearm used in the shooting was found beneath the driver’s seat of the vehicle he was driving. One live round was stuck in the barrel of the weapon. Seven live rounds were found in the pocket of Lane’s pants.
 

 Lane gave a statement to the police, and he gave several versions of the events that occurred in Ebony’s apartment. Lane initially asserted that Smith had had the gun and the extra bullets. He also told police that a friend of his fired the third shot into Smith’s head while Smith was lying on the stairs outside Ebony’s apartment. Finally, Lane told the police that he had brought the gun to the apartment and that if Smith had found the gun, Lane would have been dead instead of Smith.
 

 An autopsy revealed that Smith suffered three gunshot wounds. He sustained a close-range shot to the left thigh that damaged major blood vessels in the leg and caused extensive bleeding and ultimately death. Smith sustained another close-range shot to the right thigh. Both bullets exited Smith’s body. Smith also sustained a superficial gunshot wound above one of his ears. The autopsy revealed that Smith sustained lacerations to his face, that his nose was broken, and that he had what appeared to be a bite mark on his left arm.
 

 Jeffrey Hill testified that he knew Ebony and Lane and that he had often heard Ebony refer to C. as Lane’s child. Rasan-jansaneice Rudolph testified that she was acquainted with Lane and Ebony. She stated that on the morning of February 7, 2007, Ebony telephoned her four times, and asked her to contact Lane on her behalf. During some of the telephone calls, Ebony told Rudolph that she believed she was having a miscarriage and that she wanted Lane to take her to the hospital. Rudolph said that she telephoned Lane and passed on the information as Ebony had requested, and Lane responded, “All right,” or “Okay.” (R. 350, 352.) Ebony denied that she asked Rudolph to contact Lane and further denied that she told Rudolph that she was having a miscarriage and needed to go to the hospital.
 

 Lane testified that he and Ebony had dated, and that Ebony had told him that C. was his child. He and Ebony had lived at his mother’s house before C. was born, and Ebony and C. moved in and out of his mother’s house on occasions thereafter. Lane testified that he and Ebony were in a dating relationship at the time of the shooting and that they were living together in Ebony’s apartment. Lane stated that he had stayed at his mother’s house on the night before Smith was shot and that Ebony had attempted to telephone him on the morning of the incident, but he did not speak to Ebony. Rudolph then telephoned him, Lane said, and told him that Ebony needed to go to the hospital and that she wanted Lane to take her. At that time, Lane testified, he had believed that Ebony was pregnant with another child, and that he was the father of that child, too. Lane said that Ebony had also told him that R. was his child; she told Lane that she had named the child after her grandfather and two uncles.
 

 Lane testified that he went to Ebony’s apartment after Rudolph contacted him. He entered the apartment using the key he and Ebony had had copied for him, because he was living in the apartment with her. He saw Ebony standing outside the children’s bedroom, and he walked into the kitchen, Lane said. Then a tall man he did not know walked up to him and
 
 *129
 
 said, “What’s up, homeboy?” (R. 371.) The man, later identified as Smith, walked up to him and pushed him against the kitchen wall, Lane said. Lane said that Smith said, “Get out of my baby mother house! Why are you here? Why are you here?” (R. 374-75.) Lane testified that he responded, “Okay, let me go. Le me get my baby and go” but that Smith did not let him leave. (R. 375.) Instead, Lane said, Smith hit him in the face more than once. Lane said he was frightened because he did not know the man and because the man had accused him of being in
 
 Ms
 
 baby’s mother’s house, when Lane thought he was the father of both of Ebony’s children. Lane said that Smith attacked him, struck him, and that when he attempted to leave the apartment, Smith dragged him toward the back of the apartment. Smith was several inches taller and heavier than Lane, Lane said.
 

 Lane also testified that he had received some threatening telephone calls before this incident. An unidentified man had called him on more than one occasion and had threatened to kill him, he said. During the scuffle, Lane said he began to wonder whether Smith was the man who had made the telephone calls. Lane stated that he and Smith fought throughout the apartment. Smith ripped Lane’s shirt off and scratched Lane when Lane tried to walk away from him, he said. At some point, Smith placed him in a choke hold, Lane said, and he bit Smith’s arm in an attempt to make Smith release him so he could get away. Lane testified that he had asthma and that he could barely breathe while Smith was attacking him.
 

 Lane testified that, at one point during the fight, Smith grabbed the sleeve of the jacket Lane was wearing. Lane pulled his arm out of the sleeve and twisted his body in an attempt to get away, and the jacket fell to the floor. Lane had a gun in the pocket of his jacket, and Smith heard the noise when the gun and the jacket fell to the floor, Lane said, and he and Smith both reached for the gun. Lane testified that he grabbed the gun and that he told Smith that he did not want to shoot him and that he just wanted to leave the apartment. Smith was behind him, Lane said, and held Lane around the waist to restrain him. Smith attempted to grab the gun, Lane said, and Lane fell to the floor. Lane said he was frightened and he believed that Smith would shoot him if he got possession of the gun. Lane testified that he continued to tell Smith that he wanted only to get C. and leave the apartment.
 

 Smith tried to choke him again, Lane said, so he turned his body and fired a shot at Smith’s leg. He testified that Smith continued to try to choke him so he fired a second shot. Lane acknowledged that he fired several shots from his gun, but he said that he did not know whether Smith was struck by any of the shots. Smith continued to hold onto him, Lane said, as he ran outside the apartment. Smith pushed him against the railing by the stairs, Lane said, and then they both fell to the ground. The gun went off when they fell, according to Lane, but again Lane said he did not know whether Smith was struck by that shot. Lane stated that he put the gun in his vehicle, then returned to the apartment and picked up his jacket, his shirt, and C., and he drove away from the scene.
 

 On cross-examination, Lane admitted that he had gone to Ebony’s apartment with a loaded weapon and enough extra bullets to reload the magazine of the weapon. He also testified that he had purchased the gun years before from a friend and that he always carried the loaded gun.
 

 Lane identified photographs of holes in the kitchen and living-room walls of Ebony’s apartment. He said that the holes
 
 *130
 
 were made when Smith threw him against them during the fight. Lane also identified photographs showing his swollen eye and injuries to his face and body that he had received during the fight with Smith.
 

 Lane’s sole argument on appeal is that the trial court erred when it refused to charge the jury on provocation manslaughter. Specifically, Lane argues that when the court refused to give his requested instruction on the ground that Lane had argued that he killed Smith in self-defense and, therefore, that he could not also rely on provocation manslaughter, the trial court’s ruling conflicted with this Court’s holding in
 
 James v. State,
 
 24 So.3d 1157 (Ala.Crim.App.2009). We agree with Lane.
 

 Defense counsel presented a written requested instruction on manslaughter, and during the charge conference he repeatedly requested that the trial court charge the jury on manslaughter. Defense counsel argued that Smith’s assault of Lane constituted legal provocation recognized by law and that there was no reasonable time for the heat of passion to cool before Lane killed Smith. The trial court declined to charge the jury on manslaughter, finding that the assault did not constitute sufficient heat of passion. The court further stated: “It’s either self defense or it’s the other. It’s not going to be both. All you’ve argued the entire trial was ‘self defense, self defense, self defense.’ ” (R. 441.)
 

 In
 
 James v. State,
 
 the trial court refused to charge the jury on provocation manslaughter based on its determination that James was either guilty of murder or innocent because he acted in self-defense. This Court held that the trial court erred and that the evidence presented sufficient evidence of provocation requiring submission of the issue for decision by the jury, and we reversed the trial court’s judgment. We also held that self-defense and provocation manslaughter are not mutually exclusive concepts. Our decision in
 
 James
 
 mandates a reversal in this case; the jury should have been instructed on provocation manslaughter.
 

 First, we note that it is well established that a defendant charged with a greater offense is entitled to have the trial court instruct the jury on lesser-included offenses when there is a reasonable theory from the evidence that supports the lesser-included offense. In
 
 Williams v. State,
 
 938 So.2d 440 (Ala.Crim.App.2005), this Court stated:
 

 “An accused has the right to have the jury charged on ‘ “any material hypothesis which the evidence in his favor tends to establish.” ’
 
 Ex parte Stork,
 
 475 So.2d 623, 624 (Ala.1985). ‘In determining whether an instruction was supported by the evidence the question is not whether the Supreme Court or Court of Criminal Appeals believes the evidence, but simply whether such evidence was presented.’
 
 Id.
 
 ‘[Ejvery accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.’
 
 Ex parte Chavers,
 
 361 So.2d 1106, 1107 (Ala.1978). ‘ “ ‘It is a basic tenet of Alabama law that “a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, ... and the [trial] court’s failure to give those instructions is reversible error.” ””
 
 Ex parte McGriff,
 
 908 So.2d 1024, 1035 (Ala.2004), quoting
 
 Winner Int’l Corp. v. Common Sense, Inc.,
 
 863 So.2d 1088, 1091 (Ala.2003), quoting in turn other cases. ‘In order to determine whether the evidence is sufficient to necessitate an instruction and to allow
 
 *131
 
 the jury to consider the defense, we must view the testimony most favorably to the defendant.’
 
 Ex parte Pettway,
 
 594 So.2d 1196, 1200 (Ala.1991).”
 

 938 So.2d at 444-45.
 

 Second, we must consider whether the evidence supported a jury charge on provocation manslaughter based on the facts of this case.
 

 “A person commits the crime of manslaughter if ... [h]e causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself.”
 

 § 13A-6-3(a)(2), Ala.Code 1975. This Court has recognized that “§ 13A-6-3(a)(2) is designed to cover those situations where the jury does not believe a defendant is guilty of murder but also does not believe the killing was totally justified by self-defense.”
 
 Shultz v. State,
 
 480 So.2d 73, 76 (Ala.Crim.App.1985).
 

 “Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative.”
 

 Rogers v. State,
 
 819 So.2d 643, 662 (Ala.Crim.App.2001).
 

 Extensive testimony was presented at trial that Lane and Smith engaged in a lengthy scuffle throughout the apartment, and Lane and Ebony testified that Smith was the aggressor. Smith was somewhat larger than Lane, and it appears that he had the element of surprise on his side, because Lane did not appear to have expected that another man would be at Ebony’s apartment. Lane sustained obvious injuries during the fight. There was some evidence indicating that Lane had received threatening telephone calls before this incident occurred and that Lane believed during the fight that Smith might kill him. We find it significant, also, that Lane did not draw the gun and fire upon Smith immediately upon entering the apartment. Rather, the evidence suggests that the two men fought in nearly every room of the apartment before, according to Lane, Smith was restraining him from behind and the jacket with the gun fell to the floor and Smith began to fight for possession of the gun. We do not hesitate to hold that the evidence presented here, including the evidence indicating that Lane was assaulted and was in fear for his life, was provocation recognized by the law that necessitated a jury instruction on provocation manslaughter. The credibility of the evidence was a decision for the jury, with proper instruction. The trial court’s failure to so instruct the jury constitutes reversible error.
 

 The trial court apparently declined to charge the jury on provocation manslaughter based at least in part on its belief that that theory was inconsistent with the theory of self-defense. We have already held otherwise.
 
 James v. State,
 
 24 So.3d at 1161 (“Self-defense and provocation manslaughter are not mutually exclusive, and whether there was sufficient provocation recognized by law was a question for the jury.”). See also
 
 McDowell v. State,
 
 740 So.2d 465, 469 (Ala.Crim.App.1998) (“It also appears that the trial court concluded that the evidence presented supported a jury charge on either self-defense or ‘heat-of-passion’ manslaughter, but not on both. However, the fact that McDowell argued that he had acted in self-defense did not
 
 *132
 
 preclude a jury charge on ‘heat-of-passion’ manslaughter”).
 

 We have reviewed the evidence presented in light of the foregoing principles, and we conclude that the jury should have been charged on the lesser-included offense of provocation manslaughter. As we have recognized in previous cases, self-defense and provocation manslaughter are not mutually exclusive defenses. The credibility of the evidence of provocation was a determination for the jury, and it was entitled to determine whether that evidence supported a verdict on the lesser offense. Therefore, the trial court erred when it refused to charge the jury on provocation manslaughter, and Lane is entitled to a new trial.
 

 For the foregoing reasons, the judgment of the circuit court is reversed and the cause is remanded for further proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 WISE, P.J., and WINDOM and KELLUM, JJ„ concur. MAIN, J., concurs in the result.