Rel: June 28, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

———————————————

## CR-18-0599

———————————————

## Brett Richard Yeiter

## v.

## State of Alabama

## Appeal from Escambia Circuit Court
## (CC-15-42)

On Remand from the Alabama Supreme Court

MINOR, Judge.

A jury convicted Brett Richard Yeiter of capital murder for the shooting death of his father-in-law Paul Phillips while Phillips was sitting in his parked truck. See § 13A-5-40(a)(17), Ala. Crim. App. 1975. The jury unanimously found the existence of two aggravating factors and,

by a vote of 10-2, voted for Yeiter to be sentenced to death.[1]  The trial court, believing it had to follow that recommendation under the 2017 amendment to Alabama's capital-sentencing scheme, sentenced Yeiter to death.

On original submission, this Court held that the trial court erred in admitting, over Yeiter's objection, evidence during the guilt phase about Yeiter's prior convictions and incarceration and that the admission of that evidence was not harmless error. We thus reversed Yeiter's conviction and death sentence, pretermitting consideration of the other issues Yeiter raised on appeal.  Yeiter v. State, [Ms. CR-18-0599, Dec. 17, 2021] ___ So. 3d ___ (Ala. Crim. App. 2021). The Alabama Supreme Court reversed this Court's judgment, holding that the error was harmless. State v. Yeiter, [Ms. SC-2022-0417, Sept. 2, 2022] ___ So. 3d ___ (Ala. 2022).

After reviewing those remaining issues that Yeiter preserved for

---

[1]During the penalty phase, the jury returned special verdict forms unanimously finding that the State proved beyond a reasonable doubt "that the capital offense was especially heinous, atrocious, or cruel compared to other offenses" and that Yeiter "was previously convicted of a felony involving the use or threat of violence to a person." (C. 542-43.) See § 13A-5-49(2) and § 13A-5-49(8), Ala. Code 1975.

appellate review, we find no error. But we hold that the trial court applied the wrong capital-sentencing scheme. Because Yeiter was charged with capital murder before April 11, 2017, the trial court, not the jury, has the final sentencing decision here. We thus vacate the trial court's order sentencing Yeiter to death and remand the case for the trial court to apply the correct sentencing scheme and to impose a new sentence.

## FACTS AND PROCEDURAL HISTORY

On original submission, this Court summarized the evidence presented at trial:

> "On the evening of October 26, 2014, Phillips attended the Book of Acts Holiness Church, where he was the preacher. Phillips's grandson Nathan Blair also attended the church that evening. Blair's vehicle was low on oil, so he decided to leave it parked in the church parking lot until he could get some oil. The next morning, Phillips and Blair returned to the church with oil to put in the vehicle. Yeiter, who was Phillips's son-in-law and Blair's stepfather, was already in the church parking lot. Yeiter was upset because Blair's vehicle was low on oil and Blair had allowed his vehicle to run low on oil in the past.

> "Blair testified that Yeiter 'would try to pour the oil into the car, but he would—he would try to push [Phillips], you know, like trying to, I guess trying to get him to—agitated, you know.' Blair testified that he thought Yeiter was 'trying to start a fight with' Phillips and that Yeiter 'grabbed [Phillips's] glasses off of his face' and threw them on the

3

ground. Blair testified that once they put oil in the vehicle, Phillips sent him to take a bill to Kristen Garner's house, which was 'around the corner' from the church. Before he left, Blair saw Phillips try to remove a lawnmower from the back of his truck and Yeiter tried to 'shake it away' from Phillips.

"In a statement he made to the police a week later, Yeiter said he was trying to help Phillips with the lawnmower but that he and Phillips 'got to tussling back and forth with the mower' and '[t]hat's when [Phillips] finally said he was going to get his gun. "Let me go get my gun," or something like that he said. Hell if I know.' Yeiter got in his truck, drove the short distance to his house, got his shotgun, and returned to the church. When he returned, Yeiter saw Phillips sitting in his parked truck, and the engine was running. Yeiter said he walked toward Phillips but did not see a weapon. Yeiter said he told Phillips to 'pull' his weapon, and then Yeiter shot Phillips. Yeiter said he 'believe[d]' he shot Phillips 'right in the chest.' Yeiter, however, shot Phillips in the side of his head, killing him.

"Blair returned to the church in time to hear the gunshot. He saw Yeiter in the parking lot holding a 'long' gun in his hand. Yeiter drove away, and Blair went to Phillips's truck and saw that Phillips was shot. He returned to Garner's house, and she telephoned 911.

"Yeiter stopped at Suncoast Sod, a business near the church. He went inside and told Toni Casey, who was Phillips's niece,[1] that he had shot Phillips. Yeiter gave his mobile phone to Casey and told her he did not need it anymore. Casey telephoned 911 and told them the Phillips family had 'mentally abused' Yeiter for years and that they 'just drove him crazy.'

"Emergency personnel responded to the scene within 20 minutes. Phillips was still breathing, but there was no evidence showing that he regained consciousness after Yeiter

shot him. Police did not find a gun on Phillips or in his vehicle.

"Yeiter drove west for a few days, using credit cards to buy gas and alcohol. He told law enforcement that he 'threw [the shotgun] out in the woods somewhere' in Arkansas. He said he kept the gun with him until then because he 'didn't know whether [he] was going to kill [himself] yet or not.' Law enforcement arrested Yeiter in Texas, and authorities returned him to Alabama.

"Law enforcement in Alabama interviewed Yeiter a week after the shooting. He told the police that he had consumed 'half a gallon' of liquor beginning around 7 a.m. the day he shot Phillips. He said that when he drove to his house to get his gun, he 'thought about it all the way [to his house] and all the way back.' When he made his statement to the police a week after the shooting, Yeiter said he 'would still [shoot Phillips] again because [Phillips has] had me over the years so fricking mad about everything.' He said, 'I did it .... Nothing is going to justify it.' He then told the police that he had 'been up there to Atmore before' on work release for first-degree theft of property and that he had a prior conviction in Michigan.

"An Escambia County grand jury indicted Yeiter for capital murder in January 2015. Before trial, Yeiter moved to suppress the statement he had made to the police, and he moved the trial court to remove any references to prior bad acts, including his prior convictions. The trial court denied the motions.

"At the end of the guilt phase of Yeiter's trial, the jury found him guilty of capital murder. The next day, after the evidence was presented at the penalty phase, the jury returned special verdict forms showing that it unanimously found (1) that Yeiter had a prior felony conviction involving the use or threat of violence to a person and (2) that Yeiter's crime was especially heinous, atrocious, or cruel as compared

to other capital offense. The jury recommended, by a vote of 10-2, that the trial court sentence Yeiter to death. That same day, without holding a separate hearing or entering a sentencing order, the trial court sentenced Yeiter to death.

"_____

"[1]Casey also testified that her cousin Kim was married to Yeiter."

Yeiter v. State, ___ So. 3d at ___ (footnotes and citations to the record omitted).

## STANDARD OF REVIEW

"Rule 45A, Ala. R. App. P., was amended on January 12, 2023, to state:

> "'In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.'

"Before Rule 45A was amended, this Court was required to conduct plain-error review in all cases in which the death penalty had been imposed. Although Rule 45A now provides that plain-error review is discretionary in such cases, this Court has explained that it will continue to conduct plain-error review in all cases in which the death penalty has been imposed. Iervolino v. State, [Ms. CR-21-0283, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023). However, that does not mean that this Court will provide a detailed analysis, or

6

even any analysis, of those claims that were not properly preserved for appellate review, as it historically did when plain-error review was mandatory. Id.

"The standard this Court employs in conducting plain-error review is well settled:

"'"'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.' Ex parte Trawick, 698 So. 2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error.' Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' Wilson v. State, 142 So.

> 3d 732, 751 (Ala. Crim. App. 2010). '[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982))."'

> "Iervolino, ___ So. 3d at ___ (quoting DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018))."

Henderson v. State, [Ms. CR-21-0044, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024). Because we are vacating the trial court's order sentencing Yeiter to death, we have not reviewed the record for plain error, nor have we reviewed the issues Yeiter raises in his brief on appeal but did not raise in the trial court.

## DISCUSSION

### I. MOTION TO DISQUALIFY THE DISTRICT ATTORNEY'S OFFICE

In August 2016, Yeiter moved to disqualify the District Attorney's Office for the 21st Judicial Circuit. (C. 167.) The trial court held an evidentiary hearing on the motion in November 2018. (R. 120.) James Eric Coale, an Assistant District Attorney for the 21st Judicial Circuit, testified that he was at that time and had been a partner for 22 years

8

with the law firm Otts, Moore, Coale, Godwin, Stearns & Darby. Coale testified that Michael D. Godwin was the supernumerary district attorney for the 21st Judicial Circuit. Coale testified that, while he was also an assistant district attorney, he or his law office prepared documents in December 2015 for an uncontested answer-and-waiver divorce on behalf of Kimberly Yeiter. Coale testified that he took the divorce papers to the Escambia County jail, that Yeiter signed them, and that the chief deputy for the Escambia County Sheriff's Office, Michael E. Lambert, notarized the documents.[2] Coale testified that he had no communication with Yeiter except telling him that the paperwork was there, asking him if he was ready to sign, and pointing out what Yeiter needed to sign. Coale said that he did not speak with Yeiter about the capital-murder charges and that he had not "participated in any capacity in the prosecution of Mr. Yeiter." (R. 133.) He also testified that Stearns, another partner in his law firm and an assistant district attorney, in no way participated in representing Kimberly in the divorce from Yeiter. After hearing this testimony and arguments from the parties, the trial

---

[2]Coale did not testify as to when he took the documents for Yeiter to sign, but Yeiter's motion asserts that it happened on December 17, 2015. (C. 168.)

9

court denied Yeiter's motion to disqualify the district attorney's office. (R. 143.)

On appeal, Yeiter argues that the trial court erred in denying the motion to disqualify the District Attorney's Office for the 21st Judicial Circuit. (Yeiter's brief, p. 76.) He argues that the trial court "[i]gnor[ed] the risk that Mr. Yeiter's Sixth Amendment right to counsel was violated when Mr. Coale, an officer of the State, met with Mr. Yeiter outside the presence of his attorneys and after formal charges had been initiated, see Moran v. Burbine, 475 U.S. 412, 431 (1986), and erroneously determin[ed] that there was no conflict of interest." (Yeiter's brief, p. 78.) Yeiter cites Davenport v. State, 157 Ga. App. 704, 278 S.E.2d 440 (1981), as a decision that, he says, "addressed an almost identical issue." (Yeiter's brief, p. 79.)

In Davenport, Martha Davenport was convicted in June 1978 of aggravated assault against her husband Harold Davenport. Before the assault, Martha had filed for divorce from Harold in October 1975. Harold retained Robert Keller to represent him in the divorce, which was pending from October 1975 until October 1978. In July 1977, Keller was appointed district attorney of the Clayton Judicial Circuit but did not

withdraw as Harold's attorney in the divorce action until October 1978. 157 Ga. App. at 705, 278 S.E.2d at 441.

Martha shot Harold in April 1976, and a grand jury indicted her in June 1976. Martha was arraigned in October 1977, after Keller became the district attorney. Keller signed Martha's plea of not guilty at her arraignment. An assistant district attorney handled all pretrial motions and Martha's trial, but Keller was present at the counsel table during the trial. 157 Ga. App. at 705, 278 S.E.2d at 441.

The Georgia Court of Appeals held that Martha was due a new trial because of "Keller's role in the prosecution of the case against her." 157 Ga. App. at 705, 278 S.E.2d at 441.

> "While we do not believe Mr. Keller would act intentionally in any manner which would prejudice a criminal case prosecuted by his office, we are constrained to hold that he should not have participated in any way in the prosecution of the aggravated assault case against Mrs. Davenport. It is clear that he was cognizant of information and incidents that occurred between the victim and appellant by virtue of his representation of Mr. Davenport in the divorce proceedings. Under such circumstances there is at least the appearance of impropriety, and we must conclude that appellant was denied fundamental fairness in the state's prosecution of the charges against her. 'The administration of the law, and especially that of the criminal law, should, like Caesar's wife, be above suspicion, and should be free from all temptation, bias or prejudice, so far as it is possible for our courts to accomplish it ...' Nichols v. State, 17 Ga. App. 593, 606, 87 S.E. 817

11

(1915). In our opinion public policy prohibits a district attorney from prosecuting a case, even though he does not actually try the case himself, while representing the victim of the alleged criminal act in a divorce proceeding involving the accused."

Davenport v. State, 157 Ga. App. 704, 705-06, 278 S.E.2d 440, 441 (1981).

First, Davenport is distinguishable because the trial court found that Coale had no role in Yeiter's prosecution. The trial court cited evidence showing that Coale was "walled off" from the prosecution. (R. 144 "There is a firewall. There's no relationship between Mr. Coale and this case whatsoever.").

Yeiter argues, however, that it is "immaterial" that

"Coale never participated in any capacity in the prosecution of Mr. Yeiter … because Mr. Stearns—Mr. Coale's partner in their private law firm—was one of the lead prosecutors in Mr. Yeiter's case. Under these circumstances it was possible that Mr. Stearns 'obtained confidential information which would be helpful' in Mr. Yeiter's prosecution."

(Yeiter's brief, p. 80 (citing State v. Hatfield, 218 Neb. 470, 473, 356 N.W.2d 872, 875 (1984).) In Hatfield, the Nebraska Supreme Court stated:

"We do agree that a prosecuting attorney who himself, or a member of his same firm, has represented the spouse of a defendant should be disqualified from prosecuting such defendant for a crime arising out of the marriage relationship. Disqualification would also be proper where, because of such

12

representation, it is shown that the attorney has obtained confidential information which would be helpful in such criminal prosecution."

218 Neb. at 473, 356 N.W.2d at 875 (citations omitted). Neither scenario identified by the Nebraska Supreme Court, however, is present. Unlike the crime in Davenport, Yeiter's crime did not "aris[e] out of the marriage relationship." And the only evidence before the trial court was that Coale had no role in Yeiter's prosecution and that Stearns had no role in Kimberly's divorce. Nothing suggests that either attorney obtained confidential information used against Yeiter in the capital-murder prosecution.

In a footnote, Yeiter asserts that "Mr. Coale's conflict of interest was imputed to Mr. Stearns," and Yeiter cites, with no explanation, Rule 1.10(a), Ala. R. Prof'l Conduct. Rule 1.10(a) provides: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any of them, practicing alone, would be prohibited from doing so by Rules 1.7, 1.8(a)-1.8(k), 1.9, or 2.2." Yeiter has not shown that Coale or Stearns had a conflict, however, and thus no conflict could be imputed under this rule.

Finally, Yeiter asserts:

13

"[T]he settlement agreement between Mr. Yeiter and Kimberly Yeiter, which Mr. Yeiter signed while incarcerated at Escambia County Jail awaiting trial for capital murder after being cornered by Mr. Coale outside the presence of his attorneys, awarded significant property to Kimberly Yeiter. This transference of high-value marital property, combined with the relationship between the divorce and the alleged crime that preceded the divorce, undoubtedly planted improper seeds of motivation in the State's mind and created a great risk that the State would fail to 'execute its discretionary function in an evenhanded manner.'"

(Yeiter's brief, pp. 80-81 (emphasis added) (quoting State v. Cope, 50 P.3d 513, 515 (Kan. Ct. App. 2002).) Yeiter contends that "[p]articipation by the District Attorney's office in Mr. Yeiter's capital murder trial caused 'injury to the entire system of justice,' Hannon, 266 So. 2d at 829, and denied Mr. Yeiter the 'fundamental fairness assured by the Due Process Clause of the Fourteenth Amendment.' Ganger, 379 F.2d at 714." (Yeiter's brief, p. 81.)

First, there is no evidence of Coale "cornering" Yeiter at the jail. Nor was there merely an "alleged crime that preceded the divorce"— Yeiter in fact murdered Phillips. And Yeiter has not explained or shown what "improper seeds of motivation" could have been "planted … in the State's mind." In short, Yeiter's arguments on this issue lack merit. He is due no relief.

14

## II. DENIAL OF YEITER'S MOTION TO USE JUROR QUESTIONNAIRES

Yeiter argues that the trial court erred in denying his "unopposed" motion for juror questionnaires. (C. 243, 391; R. 264.) (Yeiter's brief, p. 31.) We disagree.

A trial court has broad discretion in handling voir dire, and its rulings will not be reversed without a showing of an abuse of that discretion. McWhorter v. State, 781 So. 2d 257, 322 (Ala. Crim. App. 1999). The trial court's broad discretion extends to whether to permit a juror questionnaire. Brown v. State, 11 So. 3d 866, 885 (Ala. Crim. App. 2007).

Yeiter has not shown that the trial court abused its discretion in denying his request for juror questionnaires. The voir dire here covers almost 1,000 pages of the transcript. (R. 340-1303.) Yet Yeiter cites no instance of an adverse ruling during voir dire.[3] Given the extensive voir

---

[3]Yeiter also argues in this part of his brief that the trial court erred by "repeatedly rushing and limiting voir dire." (Yeiter's brief, p. 32.) Yeiter cites these pages from voir dire as examples of the trial court's allegedly erroneous conduct during voir dire: R. 475, 479, 694-95, 711, 713, 727, 762, 764, 770, 779, 823-25, 864, 890, 895-97, 920, 934-935, 939, 1122, 1177. Those cited pages include comments directed to both counsel for Yeiter and the State. Those pages show no objection from Yeiter. Thus, this issue was not preserved for review.

dire conducted by the parties and the trial court, Yeiter is due no relief on this issue.

III.    REMOVAL OF PROSPECTIVE JURORS S.T. AND T.Y.

Yeiter argues that the trial court erred by granting the State's motions to remove prospective jurors S.T. and T.Y. for cause. (Yeiter's brief, p. 54.)

Prospective juror S.T.: When the trial court asked the veniremembers if they had fixed opinions against capital punishment, prospective juror S.T. raised her hand. (R. 696.) In response to questioning from the trial court, S.T. stated: "I don't believe that one man should impose death on any other person." (R. 697.) When defense counsel asked, "[b]ut do you accept the fact that our State has decided to make [the death penalty] part of the judicial system," S.T. stated that she did accept that fact and that she understood that jurors must follow the law. (R. 698-99.) She also stated that she "[w]ould be able to follow the court's instructions and put aside personal feelings." (R. 699-700.) The State then asked S.T. whether she would "[e]ver be able to vote to impose the death penalty," and S.T. responded, "I don't know. I don't know. I don't believe in the death penalty. I get that it's a part of our judicial

system, but me personally, I can't—I don't want to impose death on anybody." (R. 700-01.) S.T. did, however, state that she could follow the trial court's instructions. (R. 701.)

In granting the State's challenge of S.T. for cause, the trial court ruled:

> "I heard her answers and I heard the intensity about she didn't know if she could [follow the court's instructions] and that she's against the death penalty. I don't think that this juror can meet that level of commitment that the law requires on that. And as a consequence, I grant the State's motion to strike her for cause.
>
> "And, again, I know what [defense counsel] said. I heard that as well. But I heard the other side of the equation and I was the one trying to kind of see, where is this lady's heart, what is it that she's thinking. And she's not in favor of the death penalty. And I don't think that she could compromise that. And if she—I just don't think she would. I don't think she would at all."

(R. 703.) Yeiter contends that S.T. gave "unequivocal statements that she could set aside her personal views and follow the law" and thus that "she was qualified to serve and could not be struck for cause." (Yeiter's brief, p. 56.)

> "'The test for determining whether a strike rises to the level of a challenge for cause is "whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence." Marshall v. State, 598 So. 2d 14, 16 (Ala. Cr. App. 1991). "Broad discretion is vested

17

with the trial court in determining whether or not to sustain challenges for cause." Ex parte Nettles, 435 So. 2d 151, 153 (Ala. 1983). "The decision of the trial court 'on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.'" Nettles, 435 So. 2d at 153.'"

Thompson v. State, 153 So. 3d 84, 115-16 (Ala. Crim. App. 2012) (quoting Dunning v. State, 659 So. 2d 995, 997 (Ala. Crim. App. 1994)). And "[t]he qualification of a juror is a matter within the discretion of the trial court. Clark v. State, 443 So. 2d 1287, 1288 (Ala. Cr. App. 1983). The trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.' Ex parte Dinkins, 567 So. 2d 1313, 1314 (Ala. 1990)." Thompson, 153 So. 3d 84 at 116.

The trial court ruled based on its observation of prospective juror S.T. including the "intensity" of her responses. Yeiter has not shown that the trial court exceeded its broad discretion in granting the State's challenge for cause as to prospective juror S.T.

Prospective juror T.Y.: When the State asked a panel of veniremembers whether any of them would "automatically vote against the death penalty," T.Y. raised her hand. (R. 1177.) The trial court later brought T.Y. in for private questioning with counsel for Yeiter and for the State:

18

"[PROSECUTOR]: [T.Y.], you responded, on a couple of questions you said you would have difficulty sitting in judgment of others.

"....

"[T.Y.]: Yes.

"[PROSECUTOR]: And you also said you would be unable to impose the death penalty if Mr. Yeiter is found guilty.

"[T.Y.]: Of course. ….

"[DEFENSE COUNSEL]: … Now, Ms. [Y.], you have stated you do not favor the death penalty; is that correct?

"[T.Y.]: That's correct.

"[DEFENSE COUNSEL]: Okay. That is your personal feelings?

"[T.Y.]: Yeah. Religious beliefs and personal feelings. I work in Holman Correctional Facility where there are executions. I do not work in the executions place.

"[DEFENSE COUNSEL]: Okay. But you do accept the fact that our State has decided to make it part of the criminal justice system. You accept the fact it is part of the law.

"[T.Y.]: It is a part of the law.

"[DEFENSE COUNSEL]: And you understand that for our system to function, jurors, like you, must follow the law as the court sets it out. Do you understand that?

"[T.Y.]: I understand.

"[DEFENSE COUNSEL]: Now, you're the judge of the facts,

Judge Rice is the judge of the law. Do you agree with that?

"[T.Y.]: Uh-huh.

"[DEFENSE COUNSEL]: Okay. And you understand, if you were selected as a juror in the case, Judge Rice would tell you what the—tell you what law you were to apply concerning all aspects of this case including, if reached, punishment; the death penalty or life without parole. You understand he would be the one to instruct you under the law, correct?

"[T.Y.]: Yes, I do.

"[DEFENSE COUNSEL]: And you would be able to follow the court's instructions and put aside any personal feelings and do what—"

(R. 1260-62.)  The trial court, stating it was "just trying to move along,"

interrupted defense counsel and questioned T.Y.:

"THE COURT: … As I understood, you have a religious conviction against imposing the death penalty?

"[T.Y.]: Yes, I do.

"THE COURT: Is there any circumstance in this case where, if it made it to that point where you were called upon to vote death or not, that you would just not ever be able to vote for [the] death penalty?

"[T.Y.]: I would not.

"THE COURT: Okay.  Follow up on that?

"[PROSECUTOR]: No, Your Honor.

"[DEFENSE COUNSEL]: You could follow the law, though,

correct? Whatever the law told you to do.

"[T.Y.]: Uh-huh.

"[DEFENSE COUNSEL]: So she just said that she could follow the law and that's a requirement of a juror. So if the court instructs her as to what—

"THE COURT: I'm the one that makes those decisions.

"My question is do you have—

"[T.Y.]: I will not vote death penalty at all.

"THE COURT: Follow up from defense in regard to that comment?

"[DEFENSE COUNSEL]: No, sir."

(R. 1262-63.)

The State then moved to strike T.Y. for cause. Given a chance to respond, defense counsel had "[n]o response." (R. 1263.) The trial court then granted the State's motion:

"It's obvious. She has a religious conviction and she says—I'm reading the demeanor and what she's saying and the intensity. It doesn't make any difference what it is, she doesn't have in her mind—or she has in her mind that she would never impose the death penalty. And that is a strike for cause and I grant the strike for cause."

(R. 1263-64.)

Yeiter argues that the trial court erred by, he says, "preventing

defense counsel from properly questioning T.Y. on her ability to follow the law, and subsequently extracting a prejudicial answer from her." (Yeiter's brief, p. 57.) Although we question whether Yeiter preserved this issue, it has no merit.

First, as the above shows, the trial court gave defense counsel the chance to keep questioning T.Y., but counsel chose not to. Second, as with prospective juror S.T., the trial court's ruling was based on its observation of prospective juror T.Y., including the "intensity" of her responses and her demeanor. Yeiter has not shown that the trial court exceeded its broad discretion in granting the State's challenge for cause as to prospective juror T.Y. Thompson, 153 So. 3d at 115-16. See also Johnson v. State, 820 So. 2d 842, 856 (Ala. Crim. App. 2000) ("Clearly, as evidenced by the above-referenced portions of the record, this juror unequivocally stated that he could not impose the death penalty under any circumstances. The trial court correctly granted the State's challenge for cause of this juror.").

Yeiter is due no relief on this issue.

IV.   ALLEGED JUROR MISCONDUCT BY JUROR M.K.

During voir dire, the State asked prospective jurors if "any of you

or any member of your immediate family … [had] ever been arrested by any member or officer of the Escambia County Sheriff's Department." (R. 958.) Yeiter argues that he was "deprived … of his right 'to truthfully know jurors' biases' and, therefore, to a fair and impartial proceeding" because, he says, M.K., the foreperson of the jury, did not disclose that she had prior arrests in Escambia County. (Yeiter's brief, p. 67 (citations omitted).) Defense counsel raised this issue in a motion for a new trial, asserting that M.K. "failed to truthfully respond and did not disclose prior arrests." (C. 555.) At the hearing on the motion, Yeiter offered records that, he said, showed that M.K. had misdemeanor charges in Escambia County in 2010 for criminal trespass and harassment. (R. 1983-84; Supp. C. 378-79.) According to defense counsel, the charges were later nolle prossed upon motion of the district attorney. The trial court denied Yeiter's motion, holding that, as for M.K.'s failure to disclose, "the court does not see that that rises to the level that would require a retrial." (R. 1985.)

On appeal, Yeiter characterizes the two pages of records he offered at the hearing on the new-trial motion as "showing that M.K. had been arrested in Escambia County in 2010 and charged with criminal trespass

23

and harassment." (Yeiter's brief, p. 68.) He asserts that although "those charges were subsequently nolle prossed upon motion of the district attorney, the question posed during voir dire concerned arrest history and M.K. no doubt should have responded affirmatively." (Yeiter's brief, pp. 68-69.) He argues that the trial court abused its discretion in denying his motion for a new trial "without conducting any of the requisite analysis." (Yeiter's brief, p. 69 (citing Porter v. State, 196 So. 3d 365, 371 (Ala. Crim. App. 2015).) That analysis, Yeiter argues, should have included considering the factors stated in Ex parte Dobyne, 805 So. 2d 763 (Ala. 2001), for determining whether a party was prejudiced by a prospective juror's failure to answer a question during voir dire.

The State, on the other hand, argues that the trial court did not abuse its discretion. The State correctly notes that Yeiter had the burden of proving "the allegations of his motion—that the juror committed the alleged misconduct—to the satisfaction of the trial court." (State's brief, p. 29 (citing Dawson v. State, 710 So. 2d 472, 475 (Ala. 1997).) Citing the two pages of records that Yeiter offered, the State contends that Yeiter offered nothing—such a date of birth or Social Security number—to show that the records involved the same M.K. who served as the foreperson of

24

his jury. The State also notes that Yeiter did not call M.K. as a witness at the hearing to verify that she was the person referenced in the "SJIS display" on the two pages of records or to ask her any questions about the circumstances of the alleged charges. (State's brief, p. 29.) Thus, the State argues that Yeiter simply failed to prove his claim and that the circuit court did not abuse its discretion in denying it.

> "In Dobyne, the Alabama Supreme Court held:
>
>> "'The proper standard for determining whether juror misconduct warrants a new trial, as set out by this Court's precedent, is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant. See Ex parte Stewart, 659 So. 2d 122 (Ala. 1993); Campbell v. Williams, 638 So. 2d 804 (Ala. 1994); Union Mortgage Co. v. Barlow, 595 So. 2d 1335 (Ala. 1992), cert. denied, 506 U.S. 906, 113 S. Ct. 301, 121 L. Ed. 2d 224 (1992). The "might-have-been-prejudiced" standard, of course, casts a "lighter" burden on the defendant than the actual-prejudice standard. See Tomlin v. State, [695 So. 2d 157, 170 (Ala. Crim. App. 1996)]. For a more recent detailed discussion of the burden of proof required to make a showing under the "might-have-been-prejudiced" standard, see Ex parte Apicella, [809 So. 2d 865, 871 (Ala. 2001)] ("It is clear, then, that the question whether the jury's decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case." (Emphasis original.)).

"'It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely. See Fabianke v. Weaver, 527 So. 2d 1253 (Ala. 1988). However, not every failure to respond properly to questions propounded during voir dire "automatically entitles [the defendant] to a new trial or reversal of the cause on appeal." Freeman v. Hall, 286 Ala. 161, 166, 238 So. 2d 330, 335 (1970); see also Dawson v. State, [710 So. 2d 472,] 474 [ (Ala. 1997)]; and Reed v. State, [547 So. 2d 596 (Ala. 1989)]. As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is "whether the defendant might have been prejudiced by a veniremember's failure to make a proper response." Ex parte Stewart, 659 So. 2d at 124. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court's discretion. Eaton v. Horton, 565 So. 2d 183 (Ala. 1990); Land & Assocs., Inc. v. Simmons, 562 So. 2d 140 (Ala. 1989) (Houston, J., concurring specially).

"'"The determination of whether the complaining party was prejudiced by a juror's failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: 'temporal remoteness of the matter inquired about, the ambiguity of the question

26

> propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.'"
>
> "'Union Mortgage Co. v. Barlow, 595 So. 2d at 1342-43 (quoting Freeman v. Hall, supra (other citations omitted)).'
>
> "805 So. 2d at 771-72 (footnote omitted). The Court went on in Dobyne to explain that
>
> > "'[t]he form of prejudice that would entitle a party to relief for a juror's nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror. Ex parte Ledbetter, 404 So. 2d 731 (Ala. 1981); Warrick v. State, 460 So. 2d 320 (Ala. Crim. App. 1984); and Leach v. State, 31 Ala. App. 390, 18 So. 2d 285 (1944). If the party establishes that the juror's disclosure of the truth would have caused the party either to (successfully) challenge the juror for cause or to exercise a peremptory challenge to strike the juror, then the party has made a prima facie showing of prejudice. Id. Such prejudice can be established by the obvious tendency of the true facts to bias the juror, as in Ledbetter, supra, or by direct testimony of trial counsel that the true facts would have prompted a challenge against the juror, as in State v. Freeman, 605 So. 2d 1258 (Ala. Crim. App. 1992).'
>
> "805 So. 2d at 772-73."

Porter v. State, 196 So. 3d 365, 368-69 (Ala. Crim. App. 2015).

27

In <u>Porter</u>, this Court held that the trial court had not properly applied the <u>Dobyne</u> factors in its analysis of whether the defendant might have been prejudiced by juror R.R.'s failure to respond that he had a conviction for DUI when the prosecutor asked "whether any prospective juror had 'been arrested, charged or convicted of a crime." 196 So. 3d at 367, 371. This Court also noted that defense counsel stated in an affidavit "that knowledge of juror R.R.'s arrest history would have prompted him to ask further questions and to seriously consider challenging him for cause or exercising a peremptory strike." 196 So. 3d at 371.

The two-page record that Yeiter offered in support of his juror-misconduct claim includes the same name as M.K., lists two misdemeanor charges, and lists as the date of the charges August 2010. The record also includes "NOL PRS/DA MOTION," which presumably means, as Yeiter's counsel asserted at the hearing, that the charges were nolle prossed on the motion of the district attorney. The record includes several codes, but Yeiter offered no evidence to explain what the codes mean.

Unlike the broad question asked by the prosecutor in <u>Porter</u>, the

question here concerned only a prior arrest. So far as we can determine, however, the two-page record does not show that M.K. was <u>arrested</u> on the 2010 misdemeanor charges. What's more, Yeiter's attorney did not include an affidavit stating that knowledge of the 2010 charges "would have prompted him to ask further questions and to seriously consider challenging [M.K.] for cause or exercising a peremptory strike." 196 So. 3d at 371. Nor can we say that the limited record Yeiter offered shows "the obvious tendency of the true facts to bias the juror." 196 So. 3d at 369. Thus, <u>Porter</u> does not support Yeiter's claim.

Based on the limited evidence Yeiter offered in support of his claim, we cannot say that the trial court should have analyzed the <u>Dobyne</u> factors, nor can we say that the trial court abused its discretion in denying the claim. Yeiter is due no relief.

## V. ADMISSION OF YEITER'S STATEMENT TO THE POLICE

Yeiter argues that the trial court erred in admitting his November 3, 2014, statement to Deputy Billy Blair and Investigator Adam Johnson, employees with the Escambia County Sheriff's Office. (Yeiter's brief, p. 48.) Before trial, Yeiter moved to suppress the statement. (C. 303.) The trial court held a hearing on the motion at which Deputy Blair and

Investigator Johnson testified. At that hearing, the State offered a recording and a transcript of the statement and a waiver-of-rights form signed by Yeiter, Blair, and Johnson. (Supp. C. 214-15.) After the hearing, the trial court denied the motion, and the trial court admitted the statement over Yeiter's objection at trial.[4]

Yeiter argues that his "inculpatory statement" was "elicited after [he] invoked his right to counsel and did not reinitiate contact with authorities." (Yeiter's brief, p. 49.) He argues that the admission of the statement "violated his rights against self-incrimination and to counsel and his rights to due process, a fair trial, and a reliable conviction and sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Alabama law." (Yeiter's brief, pp. 53-54.) He contends that the admission of his statement was reversible error

---

[4]On original submission, this Court agreed with Yeiter's argument that, during the State's case-in-chief in the guilt phase, the trial court erred by not redacting evidence of prior bad acts from Yeiter's statement to law enforcement, and we reversed his conviction and sentence. (Yeiter's brief, p. 11.) On certiorari review, the Alabama Supreme Court reversed our judgment and held that any error in the admission of that statement was harmless beyond a reasonable doubt. State v. Yeiter, [Ms. SC-2022-0417, Sept. 2, 2022] ___ So. 3d ___, ___ (Ala. 2022).

under the principles recognized in <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981). (Yeiter's brief, p. 48.)

Yeiter gave a statement on November 3, 2014, in Deputy Blair's office, which was located "across from the county jail." (R. 180.) The statement began with Yeiter stating his name, his date of birth, and his highest level of education, a G.E.D. Then this happened:

> "INVESTIGATOR JOHNSON: Okay. I guess you know what we want to talk to you about but before we do I have to read you your rights.
>
> "[YEITER]: Sure.
>
> "INVESTIGATOR JOHNSON: And I'm going to show it to you while I read it and we'll go over it. If you have any questions just stop me and we'll go over any part of it.
>
> "You must understand your rights before we ask you any questions. You have the right to remain silent. Anything that you say can be used against you in court. You have the right to talk to a lawyer for advice before being questioned. You have the right to have him with you during questioning. If you cannot afford a lawyer and want one a lawyer will be appointed for you by the court. If you decide to answer questions now without a lawyer present you will still have the right to stop the questioning at anytime. You also have the right to stop the questioning at any time til you speak to a lawyer.
>
> "[YEITER]: <u>I guess I'm going to need a lawyer because they going to give me one when I go over there regardless if I need one or not.</u>

"INVESTIGATOR JOHNSON: Well, they are going to give you an attorney but you don't have to have one to speak with us but that's your rights. It's up to you.

"[YEITER]: Well, the more I speak to y'all the more I incriminate myself, right?

"INVESTIGATOR JOHNSON: Well, I mean we've got our case proven but we would like to hear your side of the story.

"[YEITER]: Yeah, I can. I mean …

"INVESTIGATOR JOHNSON: I mean but before—before I can ask you any questions about your side of the story I have to read you your rights.

"[YEITER]: I'll sign it.

"INVESTIGATOR JOHNSON: You sure?

"[YEITER]: Yeah.

"INVESTIGATOR JOHNSON: I mean that's up to you.

"Okay. Date, time, sign it and print. I'm tell [sic] you the date. Today's date—

"[YEITER]: Can you answer me one question. I'm going to sign this.

"INVESTIGATOR JOHNSON: Okay.

"[YEITER]: I want one—Hang on.

"INVESTIGATOR JOHNSON: Today's date is November 3rd, and the time is 10:31.

"The second part is a waiver of rights. It says, I do not want a lawyer at this time. I understand and know what I'm doing. No promises or threats have been made to me and no pressure or force of any kind as been used against me. I hereby voluntarily and intentionally waive my rights, and I'm willing to make a statement or answer questions.

"But even though you sign this saying you waive your rights and you want to talk to me you can stop at any time. You understand?

"[YEITER]: Yeah.

"INVESTIGATOR JOHNSON: Sign, date and time. Same date, and time is 10:32 now.

"Are you on any medication?

"[YEITER]: Nah. I don't want to pay for it.

"INVESTIGATOR JOHNSON: Sir?

"[YEITER]: Y'all going to have to hang on.

"INVESTIGATOR JOHNSON: Okay.

"CAPTAIN BLAIR: Have you got a question of us, Mr. Yeiter?

"[YEITER]: Couple of them. Just hold on.

"INVESTIGATOR JOHNSON: We'll hold on. You want a tissue?"

(Supp. C. 216-19 (emphasis added).) Yeiter then asked about whether his sons were okay and whether anyone had picked up his younger son from

33

school on the day he shot Phillips and left town. He also asked about whether his wife Kimberly was "okay." (Supp. C. 220.) Investigator Johnson responded that he had talked "with all three of them and they are all okay." (Id.) Yeiter then told the officers, "Okay. That's all I need to know. What do you want to know?" (Supp. C. 221.) He then participated in the interview with the officers.

Citing the emphasized language above, Yeiter contends that he made "an unequivocal assertion of the right to counsel," and he asserts that his statement that "the more I speak to y'all the more I incriminate myself, right" "only reinforced his initial request for counsel. (Yeiter's brief, pp. 50-51.) Yeiter asserts that he "clearly 'expressed his desire to deal with the police only through counsel'" but that "the officers disregarded his requests and pushed forward, encouraging him to sign the waiver so they could talk to him." (Yeiter's brief, p. 50 (quoting Edwards, 451 U.S. at 484).) We disagree.

> "During a custodial interrogation, if the suspect unequivocally requests counsel at any time before or after the suspect waives his Miranda [v. Arizona, 384 U.S. 436 (1966),] rights, 'the interrogation must cease until an attorney is present.' Miranda, 384 U.S. at 474. If the suspect makes an equivocal reference to an attorney after waiving his Miranda rights, the interrogating officer has no obligation to stop questioning the suspect and the officer is not required to ask

34

questions to clarify whether the suspect actually wants an attorney.  Davis v. United States, 512 U.S. 452, 459-62, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). However, if a suspect makes an equivocal reference to an attorney before waiving his Miranda rights, the interrogating officer is required to ask questions to clarify the reference until the suspect either clearly invokes his right to counsel or waives it. See State v. Collins, 937 So. 2d 86, 93 (Ala. Crim. App. 2005) (holding that '[b]ecause [the defendant] did not waive her Miranda rights before she asked the questions about obtaining a lawyer, the ambiguity of her questions required the interrogating officer to ask follow-up questions to clarify the ambiguity')."

Thompson v. State, 97 So. 3d 800, 806-07 (Ala. Crim. App. 2011).

"In determining whether a suspect's statement was an unequivocal invocation of his right to counsel, we are guided by the following principles:

"'"The applicability of the '"rigid" prophylactic rule' of Edwards [v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981),] requires courts to 'determine whether the accused actually invoked his right to counsel.' Smith v. Illinois, [469 U.S. 91, 95, 105 S. Ct. 490, 492, 83 L. Ed. 2d 488 (1984)] (emphasis added), quoting Fare v. Michael C., 442 U.S. 707, 719 [99 S. Ct. 2560, 2569, 61 L. Ed. 2d 197] (1979). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. See Connecticut v. Barrett, supra, 479 U.S. [523], at 529 [107 S. Ct. [828] at 832 (1987)]. Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' McNeil v. Wisconsin, 501 U.S. [171] at 178 [111 S. Ct. [2204] at 2209 (1991).] ....

35

"'"... As we have observed, 'a statement either is such an assertion of the right to counsel or it is not.' Smith v. Illinois, 469 U.S., at 97-98 [105 S. Ct., at 494] (brackets and internal quotation marks omitted). Although a suspect need not 'speak with the discrimination of an Oxford don,' post, at 476, 114 S. Ct., at 2364 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."'

"Ex parte Cothren, 705 So. 2d 861, 864 (Ala. 1997) (quoting Davis [v. United States], 512 U.S. [452,] 458-59 [(1994)]).

"Furthermore, a suspect's reference to an attorney is equivocal if '"a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel."' Cothren, 705 So. 2d at 864 (quoting Davis, 512 U.S. at 459). '[T]he proper standard to be used in resolving this issue is an objective one—whether a police officer in the field reasonably could have concluded from the circumstances that a suspect was not absolutely refusing to talk without the assistance of an attorney.' Cothren, 705 So. 2d at 866-67.

"Equivocal has been defined as:

"'"'Having different significations equally appropriate or plausible; capable of double interpretation; ambiguous,' 5 Oxford English Dictionary 359 (2d ed., J.A. Simpson & E.S.C. Weiner, eds., 1989); and as: 'Having two or more significations; capable of more than one interpretation; of doubtful meaning; ambiguous,'

36

> > Webster's Third International Unabridged
> > Dictionary 769 (1986)."'

> "Cothren, 705 So. 2d at 866 (quoting Coleman v. Singletary,
> 30 F.3d 1420, 1425 (11th Cir. 1994))."

Thompson, 97 So. 3d at 807-08.

Under those principles, Yeiter made, at most, an equivocal reference to an attorney when he stated, "I guess I'm going to need a lawyer because they going to give me one when I go over there regardless if I need one or not." His statement, "Well, the more I speak to y'all the more I incriminate myself, right?"—either alone or when considered as a follow-up statement—also was not an unequivocal request for an attorney. Thompson, 97 So. 3d at 808 (finding equivocal the statements "I guess I got to call an attorney if I needed one, right? Is this the time now when I need to?"); see also Petersen v. State, 326 So. 3d 535, 581 (Ala. Crim. App. 2019) (finding equivocal the statements "Probably should talk to my mom and my lawyer before I go into or know what the charges are I don't know," "I guess I have to talk to my lawyer," "Maybe [I want to talk to an attorney], I don't know I'm not—attorney—

apparently I did—I don't know …," and "need an attorney").  The trial court did not err in admitting Yeiter's statement.[5]

## VI.  REFUSAL TO INSTRUCT THE JURY ON PROVOCATION MANSLAUGHTER

Yeiter argues that the trial court erred by not instructing the jury on provocation or "heat-of-passion" manslaughter (Issue II.A. in Yeiter's brief) and manslaughter due to voluntary intoxication (Issue II.B. in Yeiter's brief). Yeiter preserved only Issue II.A. as to provocation manslaughter; we thus review only that issue.

"The offense of 'heat-of-passion' manslaughter is defined
in § 13A-6-3(a)(2), Code of Alabama 1975,[6] as follows:

---

[5]What's more, as Yeiter explained in his statement, he had multiple prior convictions and was thus experienced with the criminal justice system.

[6]The version of § 13A-6-3, Ala. Code 1975, quoted here was in effect when Yeiter committed the offense. Section 13A-6-3, Ala. Code 1975, has been amended since then. See Act No. 2023-387, Ala. Acts 2023; Act No. 2024-103, Ala. Acts 2024. See also Minnifield v. State, 941 So. 2d 1000, 1001 (Ala. Crim. App. 2005) ("It is well settled that the law in effect at the time of the commission of the offense controls the prosecution. See Davis v. State, 571 So. 2d 1287, 1289 (Ala. Crim. App. 1990) ('A defendant's sentence is determined by the law in effect at the time of the commission of the offense.'); Hardy v. State, 570 So. 2d 871 (Ala. Crim. App. 1990) (unless otherwise stated in the statute, the law in effect at the time the offense was committed controls the offense); and Jefferson v. City of Birmingham, 399 So. 2d 932 (Ala. Crim. App. 1981) (law in effect at the time of the offense governs prosecution).").

"'(a) A person commits the crime of manslaughter if:

"'....

"'(2) He causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself.'

"The defendant must present evidence of legal provocation to require a charge on heat of passion.

"'"'Manslaughter is the unlawful killing of a human being without malice; that is, the unpremeditated result of passion-heated blood— caused by a sudden, sufficient provocation. And such provocation can, in no case, be less than assault, either actually committed, or menaced under such pending circumstances as reasonable to convince the mind that the accused has cause for believing, and did believe, he would be presently assaulted, and that he struck, not in consequence of a previously formed design, general or special, but in consequence of the passion suddenly aroused by the blow given, or apparently about to be given ....'"'

"Easley v. State, 246 Ala. 359, 362, 20 So. 2d 519, 522 (1944), quoting Reeves v. State, 186 Ala. 14, 16-17, 65 So. 160 (1914)."

Harris v. State, 683 So. 2d 26, 28 (Ala. Crim. App. 1996).

Yeiter asserts that he shot Phillips "after a heated struggle in which

Mr. Phillips had threatened lethal violence." (Yeiter's brief, p. 22.) He

notes that the trial court denied defense counsel's request for a charge on provocation manslaughter as a lesser-included offense. (C. 497; R. 1715.)

Yeiter argues:

"At trial, the defense relied on the theory that Mr. Yeiter was provoked by Mr. Phillips, urging the jury in its opening statement that the ultimate question in the case would 'get down to the why.' (R. 1358.) Consistent with this theory, the defense relied on evidence of a scuffle between Mr. Yeiter and Mr. Phillips before the shooting occurred (R. 1390-92, 1403, 1408, 1613-14), during which Mr. Phillips said he was going to get his gun. (R. 1610-11, 1613-14, 1741). Additional testimony from Mr. Phillips's niece, Toni Casey, and a recording of her 911 call, indicated that the Phillips [family] had 'mentally abused' Mr. Yeiter leading up to the incident and had finally pushed him over the edge. (R. 1417-18, 1491, 1739.)

"From these facts, the jury could have concluded that Mr. Yeiter did not have the specific intent to kill Mr. Phillips but instead acted under sufficient provocation to negate intent. ..."

(Yeiter's brief, pp. 25-26.) Yeiter cites Fuller v. State, 231 So. 3d 1207, 1218 (Ala. Crim. App. 2015), for its statements that manslaughter is "the unlawful killing of a human being without malice; that is, the unpremeditated result of passion—heated blood—caused by a sudden, sufficient provocation" and that "the mere appearance of imminent assault may be sufficient to arouse heat of passion." Fuller does not support Yeiter's position, however, because there was no evidence here of

40

"a sudden, sufficient provocation" or "the mere appearance of imminent

assault."

> "'A person accused of the greater offense has a right to have the court charge on lesser included offenses when there is a reasonable theory from the evidence supporting those lesser included offenses.' MacEwan v. State, 701 So. 2d 66, 69 (Ala. Crim. App. 1997). An accused has the right to have the jury charged on '"any material hypothesis which the evidence in his favor tends to establish."' Ex parte Stork, 475 So. 2d 623, 624 (Ala. 1985). '[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however[ ] weak, insufficient, or doubtful in credibility,' Ex parte Chavers, 361 So. 2d 1106, 1107 (Ala. 1978), 'even if the evidence supporting the charge is offered by the State.' Ex parte Myers, 699 So. 2d 1285, 1290-91 (Ala. 1997), cert. denied, 522 U.S. 1054, 118 S. Ct. 706, 139 L. Ed. 2d 648 (1998). However, '[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.' § 13A-1-9(b), Ala. Code 1975. 'The basis of a charge on a lesser-included offense must be derived from the evidence presented at trial and cannot be based on speculation or conjecture.' Broadnax v. State, 825 So. 2d 134, 200 (Ala. Crim. App. 2000), aff'd, 825 So. 2d 233 (Ala. 2001), cert. denied, 536 U.S. 964, 122 S. Ct. 2675, 153 L. Ed. 2d 847 (2002). '"A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury."' Williams v. State, 675 So. 2d 537, 540-41 (Ala. Crim. App. 1996), quoting Anderson v. State, 507 So. 2d 580, 582 (Ala. Crim. App. 1987)."

Clark v. State, 896 So. 2d 584, 641 (Ala. Crim. App. 2000).

In <u>Bohannon v. State</u>, 222 So. 3d 457 (Ala. Crim. App. 2015), this Court stated:

> "Here, there was no rational basis that would support a jury instruction on heat-of-passion manslaughter. Three cameras recorded the shootings. Rarely does a reviewing court have the means to review this issue with such clarity. It is clear from the videotapes that one victim did initially gently shove Bohannon; however, that act is not sufficient to constitute legal provocation for heat-of-passion manslaughter. After one victim shoved Bohannon, both victims turned their backs to Bohannon and started to walk toward their vehicle when Bohannon grabbed his gun from the back waistband of his pants and rushed after the two victims with his gun pointed at them. The victims then ran away from Bohannon and attempted to hide.
>
>> "'"Manslaughter is the unlawful killing of a human being without malice; that is, the unpremeditated result of passion-heated blood—caused by a sudden, sufficient provocation. And such provocation can, in no case, be less than assault, either actually committed, or menaced under such pending circumstances as reasonable to convince the mind that the accused has cause for believing, and did believe, he would be presently assaulted, and that he struck, not in consequence of a previously formed design, general or special, but in consequence of the passion suddenly aroused by the blow given, or apparently about to be given ...."'
>
> "<u>Easley v. State</u>, 246 Ala. 359, 362, 20 So. 2d 519, 522 (1944), quoting <u>Reeves v. State</u>, 186 Ala. 14, 16–17, 65 So. 160 (1914).
>
>> "'Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to

manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative.'

"Spencer v. State, 58 So. 3d 215, 245 (Ala. Crim. App. 2008).

"'A minor or technical assault or battery is insufficient, but a blow inflicting considerable pain or injury ordinarily is sufficient Easley v. State, 246 Ala. 359, 20 So. 2d 519 (1945); Buffalow v. State, 219 Ala. 407, 122 So. 633 (1929). Mere abusive or opprobrious words or insulting gestures are insufficient. Cates v. State, 50 Ala. 166 (1874); Easley v. State, supra; Weaver v. State, 1 Ala. App. 48, 55 So. 956, rehearing denied, 2 Ala. App. 98, 56 So. 749 (1911). In a mutual fight where no more than ordinary battery was intended, the blows may constitute provocation, but use of deadly weapon or undue advantage is usually murder. Diamond v. State, 219 Ala. 674, 123 So. 55 (1929); Lanier v. State, 31 Ala. App. 242, 15 So. 2d 278 (1943).'

"Commentary to § 13A-6-3, Ala. Code 1975.

"In Living v. State, 796 So. 2d 1121 (Ala. Crim. App. 2000), this Court found that the circuit court did not err in refusing to give a jury instruction on heat-of-passion manslaughter after the victim had shoved the defendant. We stated:

"'"[A]n extreme emotional or mental disturbance, without legally recognized provocation, will not reduce murder to manslaughter." MacEwan v. State, 701 So. 2d [66,] 70 [(Ala. Crim. App. 1997)]

43

(quoting <u>Gray v. State</u>, 482 So. 2d 1318, 1319 (Ala. Crim. App. 1985)). Moreover, [the victim] shoving [the defendant] during an argument does not constitute legal provocation for heat-of-passion manslaughter. "A minor technical assault which did not endanger life or inflict serious physical injury or inflict substantial and considerable pain would not amount to sufficient provocation." <u>Shultz v. State</u>, 480 So. 2d 73, 76 (Ala. Crim. App. 1985). Because no evidence of adequate legal provocation was presented at trial, the trial court did not err in refusing to instruct the jury on heat-of-passion manslaughter.'

"796 So. 2d at 1130. <u>See also</u> <u>Woolf v. State</u>, 220 So. 3d 338 (Ala. Crim. App. 2014)."

<u>Bohannon</u>, 222 So. 3d at 510-11.

The evidence at trial showed that Yeiter was the initial aggressor, "grabb[ing] the glasses off [Phillips's] face" (R. 1391); that he walked away from the initial confrontation and drove a half-mile to his house to get his shotgun; that he drove back to the church; and that he shot Phillips while Phillips was sitting inside his idling truck unarmed and with his seatbelt buckled. (Supp. C. 234.) Yeiter told the police that it was "premeditated murder" and that he "thought about it all the way [home] and all the way back." (Supp. C. 233.) Yeiter's request for a charge on heat-of-passion manslaughter had no support in the law or the evidence.

Thus, the trial court did not err in refusing Yeiter's request for a charge on heat-of-passion manslaughter, and Yeiter is due no relief.

VII.   EXCLUSION OF TESTIMONY FROM JEWELL PHILLIPS

Yeiter argues that the trial court erred in not allowing Jewell Phillips—who was married to Phillips for over 50 years—to testify at the penalty phase that, in her opinion, Phillips would not have wanted Yeiter sentenced to death. (Yeiter's brief, p. 37.)

During the penalty phase, Yeiter called Jewell as a witness. (R. 1808.)  In response to defense counsel's question,[7] Jewell testified: "I don't want him to have the death penalty. I don't believe in it." (R. 1838.) Jewell testified that she "still love[d] Brett Yeiter" and that she thought executing him "would cause [her] family … more pain." (R. 1838.)

The State objected when defense counsel asked Jewell whether Phillips would "want the death penalty" for Yeiter. (R. 1839.) The trial court sustained the objection: "That is the mental operation of somebody else and under our rules of evidence, that is not permitted." (R. 1839.)

On appeal, Yeiter argues that "[u]nder Alabama law, a victim's

---

[7]The State objected to the question at first. (R. 1810.) After a lengthy discussion outside the presence of the jury, the State withdrew its objection. (R. 1833.)

family member may recommend leniency or request a lesser sentence during the sentencing hearing and this recommendation should be considered as a [nonstatutory] mitigating factor." (Yeiter's brief, p. 38.) For many reasons Yeiter asserts that the trial court erred.

This Court addressed an almost identical claim in Smith v. State, [Ms. CR-17-1014, Sept. 2, 2022] ___ So. 3d ___ (Ala. Crim. App. 2022), cert. denied (No. SC-2022-1033, June 23, 2023):

> "Smith argues that the trial court 'improperly prohibited [him] from introducing a victim's family member's request for leniency' during the sentencing phase. (Smith's brief, p. 36.) Specifically, Smith argues that the trial court erred when it prevented Bobby Bennett, the brother of David Bennett, from testifying that he was in favor of Smith's being sentenced to life imprisonment without the possibility of parole. (Smith's brief, p. 36.) According to Smith, 'victim requests for leniency are admissible' and the trial court erred in not allowing the jury to consider Bobby's testimony as a mitigating circumstance. Thus, Smith says the trial court denied him 'his right to present mitigating evidence and receive an individualized sentencing determination under Lockett [v. Ohio, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978)], Tennard [v. Dretke, 542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004)], and [Ex parte] Carroll[, 852 So. 2d 833 (Ala. 2002)], and his rights to have mitigation found and considered, a complete defense, due process, a fair trial, and a reliable sentence.' (Smith's brief, pp. 38-39.)

> "This Court, however, rejected this precise claim in Barbour v. State, 673 So. 2d 461 (Ala. Crim. App. 1994):

>> "'"In Payne [v. Tennessee, 501

46

U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991)], the court held that if the State 'chooses to permit the admission of victim impact evidence and prosecutorial argument on the subject, the Eighth Amendment erects no per se bar.' McMillian v. State, 594 So. 2d 1253, 1275 (Ala. Cr. App. 1991). Payne did not address the issue in this case, whether a request for leniency by the victim's family can properly be considered as a mitigating circumstance.

"'"The United States Supreme Court in Eddings v. Oklahoma, 455 U.S. 104 [102 S. Ct. 869, 71 L. Ed. 2d 1] (1982), held that the sentencer in capital cases must be permitted to consider any relevant mitigating factor touching the defendant's character and record.

"'"The Court is aware of three cases which address the specific issue presented. In Floyd v. State, 497 So. 2d 1211 (Fla. 1986), the court held the testimony of the murder victim's daughter that she and the victim opposed capital punishment was mitigating evidence. However, on retrial of the case, the trial judge refused to allow the victim's daughter to testify to her opinion as to whether Floyd should be executed and the Florida Supreme Court held that the trial judge did not abuse his discretion. Floyd v. State, 569 So. 2d 1225 (1990),

47

cert. denied, 501 U.S. 1259, 111 S. Ct. 2912 [115 L. Ed. 2d 1075] (1991). The Tenth Circuit Court of Appeals held that a victim's relative was properly prohibited from expressing her opinion that the death penalty should not be imposed in Robison v. Maynard, 829 F.2d 1501 (10th Cir. 1987) (applying Oklahoma law). See Robison v. Maynard, 943 F.2d 1216 (10th Cir. 1991) (the court reached the same conclusion upon consideration after Payne v. Tennessee, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) was decided). See Kathryn E. Bartolo, Payne v. Tennessee: The Future Role of Victim's Statements of Opinion in Capital Sentencing Proceedings, 77 [Iowa] L. Rev. 1217 (1992).

"'"The Alabama Supreme Court recently held that the defendant's 'Eighth Amendment rights were violated if the trial judge ... considered the portions of the victim impact statement wherein the victim's family members offered their characterizations or opinions of ... the appropriate punishment.' Ex parte McWilliams, 640 So. 2d 1015 (Ala. 1993).

"'"The Court held that opinions of family members as to the appropriate punishment either for the death penalty, Ex parte McWilliams, or against the death penalty, Robison I & II, are inadmissible. The reasoning of

48

the Court in <u>Robison I</u> is persuasive. The Court reasoned that such opinion evidence is not relevant because mitigating evidence is composed of evidence of the defendant's character or record or any of the circumstances of the offense, and the witnesses' opinion of the appropriate punishment is not relevant to either. In <u>Robison II</u> the court further explained its holding in <u>Robison I</u>, and, notwithstanding that the jury is the sentencing authority in Oklahoma, the court's reasoning is also persuasive. The court said that the proffered testimony 'was calculated to incite an arbitrary response [from the jury], thus it was properly excluded.' <u>Robison II</u> at 1217."

"'The trial court's ruling was correct for the reasons stated by the Alabama Supreme Court in <u>McWilliams v. State</u>, 640 So. 2d 1015, 1017 (Ala. 1993). The court stated:

"'"In <u>Booth v. Maryland</u>, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987), the United States Supreme Court vacated a death sentence, holding that it violated the defendant's Eighth Amendment rights for the sentencer to consider victim impact statements in sentencing the defendant to death. The victim impact statements in that case contained the same types of information as were in the statements in the present case. In <u>Payne v. Tennessee</u>, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991),

49

the Supreme Court partially overruled <u>Booth</u>. The Court in <u>Payne</u> held that the defendant's Eighth Amendment rights were not violated by the trial court's consideration of statements regarding the victims and the impact of their deaths upon the family members. The victim impact statements in <u>Payne</u> did not contain characterizations or opinions about the defendant, the crime, or the appropriate punishment. That portion of <u>Booth</u> that proscribed the trial court's consideration of that type of statement was, therefore, left intact by <u>Payne</u>.

"'"<u>We conclude that McWilliams's Eighth Amendment rights were violated if the trial judge in this case considered the portions of the victim impact statements wherein the victim's family members offered their characterizations or opinions of the defendant, the crime, or the appropriate punishment</u>."

"'(Emphasis added.)'

"<u>Barbour</u>, 673 So. 2d at 468-69.

"Here, Bobby's proposed testimony that Smith should be sentenced to life imprisonment without the possibility of parole is precisely the type of testimony that <u>Payne</u>, <u>Booth</u>, and <u>McWilliams</u> prohibit. The opinion of a victim's family member as to what punishment the defendant should receive is impermissible, whether favorable to the defendant or not.[7] Thus, the trial court did not err in refusing to allow Smith to present Bobby's testimony as to what he believed the proper

50

punishment in this case should be. Accordingly, Smith is not entitled to relief on this claim.

"_____

"[7]Notably, the trial court did let Bobby testify to the fact that his family had forgiven Smith—a fact that the jury could consider when assessing the penalty-phase evidence."

Smith, ___ So. 3d at ___.

As recognized in Smith, Alabama law prohibited Jewell's testimony about what punishment she thought Phillips would want Yeiter to receive. Thus, the trial court did not err in disallowing that testimony, and Yeiter is due no relief on this claim.

## VIII. CAPITAL-SENTENCING SCHEME

In its brief the State notes that the trial court's sentencing "order does not indicate the existence or non-existence of aggravating and mitigating circumstances or make specific findings of fact" about the aggravating circumstances as required by § 13A-5-47, Ala. Code 1975. (State's brief, p. 54 n.8.) The State cites cases in which this Court has remanded the case for the trial court to make such findings. See, e.g., Phillips v. State, 287 So. 3d 1063, 1157 (Ala. Crim. App. 2015) (remanding for the trial court to clarify whether it found the existence or nonexistence of each statutory and non-statutory mitigating

circumstance); <u>Floyd v. State</u>, 289 So. 3d 337, 446 (Ala. Crim. App. 2017) (remanding for the trial court to make findings about the especially heinous, atrocious, or cruel aggravating circumstance). The State is correct. More than that, however, the record shows that, in treating the jury's verdict as binding rather than advisory, the trial court applied the wrong capital-sentencing scheme.

On original submission, we noted:

> "The trial court repeatedly stated that it had to follow the jury's verdict. (<u>See</u> R. 1934 ('[There is no] judicial override. The court has absolutely no discretion. Therefore I see no need to delay formal sentencing from the court. Because all I'm doing is pronouncing the sentence imposed by the jury.'); R. 1784 ('[J]udicial override ... no longer exists.'); R. 1813 ('Now, with the statute as it presently exists, the jury makes the decision.').) Although both the State and Yeiter agreed with the trial court, this position is erroneous.

> "Act No. 2017-131, Ala. Acts 2017, amended §§ 13A-5-45, 13A-5-46, and 13A-5-47, Ala. Code 1975, eliminated judicial override, and placed the final sentencing decision in the hands of the jury. That Act, however, did not apply retroactively to Yeiter, who was charged with capital murder before April 11, 2017—the effective date of the Act. <u>See</u> § 2, Act No. 2017-131, Ala. Acts 2017 ('This act shall apply to any defendant who is charged with capital murder after the effective date of this act and shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to the effective date of this act.'). Under the versions of §§ 13A-5-45, 13A-5-46, and 13A-5-47 applicable to Yeiter, the judge, not the jury, had the final sentencing decision."

Yeiter, ___ So. 3d at ___ n.2.

This Court has repeatedly held that Act No. 2017-131, Ala. Acts 2017, does not apply to a defendant like Yeiter who was charged with capital murder before April 11, 2017, the effective date of Act No. 2017-131, but convicted and sentenced after that date.[8]  See, e.g., Sykes v. State, [Ms. CR-2022-0546, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024) ("The new capital sentencing scheme is triggered by the date on which a defendant is charged with capital murder."); Dearman v. State, [Ms. CR-18-0060, Aug. 5, 2022] ___ So. 3d ___ (Ala. Crim. App. 2022); Young v. State, 375 So. 3d 813 (Ala. Crim. App. 2021), cert. denied (No. 1210291, Oct. 21, 2022); and Belcher v. State, 341 So. 3d 237 (Ala. Crim. App. 2020), cert. denied (No. 1200374, May 21, 2021).  Thus, the trial court erred in concluding that Act No. 2017-131 applies to Yeiter.

The procedure the trial court used here satisfied former § 13A-5-45, Ala. Code 1975.  But for treating the jury's verdict as binding rather than as an advisory verdict, the procedure likewise complied with former §

___

[8]A complaint charging Yeiter was filed on October 27, 2014. Law enforcement arrested Yeiter in November 2014, and a grand jury indicted him in January 2015. See Rule 1.4(b), Ala. R. Crim. P. ("'Charge' means a complaint, indictment, or information.").

13A-5-46, Ala. Code 1975. The procedure did not, however, comply with

former § 13A-5-47, which provided:

"(a) After the sentence hearing has been conducted, and after the jury has returned an advisory verdict … the trial court shall proceed to determine the sentence.

"(b) Before making the sentence determination, the trial court shall order and receive a written presentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case.

"(c) Before imposing sentence the trial court shall permit the parties to present arguments concerning the existence of aggravating and mitigating circumstances and the proper sentence to be imposed in the case. The order of the arguments shall be the same as at the trial of a case.

"(d) Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the presentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it.

"(e) In deciding upon the sentence, the trial court shall

determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, …. While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."

Thus, we must vacate the trial court's order sentencing Yeiter to death and remand this case for the trial court to impose a new sentence after following the procedure outlined in former § 13A-5-47. Rather than conducting a new penalty-phase proceeding before a jury, the trial court should treat the jury's penalty-phase verdict as an advisory verdict under former § 13A-5-46. The trial court also should:

(1) Under former § 13A-5-47(b), "order and receive a written presentence investigation report" and allow "the parties … to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute";[9]

(2) Under former § 13A-5-47(c), "permit the parties to present arguments concerning the existence of aggravating and mitigating circumstances and the proper sentence to be imposed in the case";

(3) Under former § 13A-5-47(d), "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any

---

[9]The trial court did not order a presentence report because the court thought that the jury's penalty-phase verdict was binding. (See, e.g., R. 1933 ("[T]here is no need for a presentence report.").)

55

additional mitigating circumstances offered pursuant to Section 13A-5-52" and "also enter written findings of facts summarizing the crime and the defendant's participation in it."

(4) As to the aggravating circumstance that the murder "was especially heinous, atrocious, or cruel compared to other capital offenses," § 13A-5-49(8), Ala. Code 1975, "'make specific findings of fact explaining why this aggravating circumstance was applicable' under the standard set forth in Ex parte Kyzer[, 399 So. 2d 330 (Ala. 1981), abrogated on other grounds by Ex parte Stephens, 982 So. 2d 1148 (Ala. 2006),]" Floyd, 289 So. 3d at 446 (quoting Miller v. State, 913 So. 2d 1148, 1152 (Ala. Crim. App. 2004)); and

(5) Pronounce Yeiter's sentence in open court, see Ex parte Kelley, 246 So. 3d 1068 (Ala. 2015).

## CONCLUSION

Because the trial court applied the wrong capital-sentencing scheme, we vacate its order sentencing Yeiter to death, and we remand this case for the trial court to apply the correct sentencing scheme as stated above and to impose a new sentence. Due return should be filed in this court no later than 120 days from the date of this opinion.

REMANDED WITH INSTRUCTIONS.

Windom, P.J., and Kellum, McCool, and Cole, JJ., concur.